

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| RUDY ABARCA, | § | No. 08-19-00038-CR |
| Appellant, | § | Appeal from the |
| v. | § | 346th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | | (TC# 20150D04057) |

## **O P I N I O N**

Rudy Abarca brings this appeal from his conviction for aggravated robbery. Abarca alleges multiple errors surrounding the admission of items of evidence, or testimony related thereto. The items of evidence include: a recording made of a jail call[1] by Abarca (State's exhibit 91), an out-of-court photo lineup, two in-court identifications of Abarca by witnesses who were previously shown photo lineups, and the admission of out-of-court statements by a non-testifying witness. Finding no error, we affirm.

---

[1] The appellate record includes several audio CDs admitted into evidence containing recordings of jail calls. One of the CDs is marked State's exhibit 91 and another is marked State's exhibit 106. Of note, we acknowledge that the labeling of these two exhibits is transposed. On appeal, Abarca raised complaints as to State's exhibit 91 but he raised no issues as to State's exhibit 106. Even though the complained-of-jail-recording is contained on State's exhibit 106, the recording is otherwise referenced throughout the trial below as State's exhibit 91. This referencing of State's exhibit 91 is carried forward in a like manner in the parties' briefing. Despite the mislabeling, the State explained in its footnote 2 that, for simplicity of briefing, it would continue to refer to State's exhibit 91 as the exhibit that contained the complained-of-call. To this practice, Abarca raised no objection by reply or otherwise. We adopt the same practice here and refer to State's exhibit 91 as the exhibit that contains the complained-of-jail-call recording.

## I. BACKGROUND

### A. The incident

On March 2, 2015, an employee of a salvage yard observed a man who appeared to be leaving the premises with something hidden under his jacket. The employee, Joel Hernandez, believed that the man was stealing something and approached him. As he did, the man displayed a gun and said, "parate" (*i.e.*, "stop"). At that point, Hernandez turned away and called his boss, Jacinto Ituarte. The man continued to walk away.

Ituarte had seen the man with Hernandez out his office window. When he learned that the man had pulled a gun, he got into his white Suburban and followed him, calling 911 as he did so. Ituarte testified that the man fired two shots at him and Ituarte responded by firing two shots from his own gun. Ituarte later stated that he was not sure if he heard shots or clicks. The man ran to another business down the street, where Ituarte saw him grab some keys from another man and rapidly drive away in a gray van with New Mexico license plates.

Jaime Cortez testified that he was working in the area when he heard shots and saw a man running and a white truck following him. The man dropped an object that looked like a car radio or stereo that he had had in his jacket. Cortez also saw that the man had a black gun. Cortez heard two "failed shots" and watched as the man tried to enter the business yard where Cortez was working but then went on to the next business yard. Cortez then saw a van speed away from the scene. Cortez later clarified that he heard one shot and two clicks, and that he did not hear any shots from the white truck.

The victim, Martin Moran Molina ("Moran"), testified that he was taking photographs of a tow truck that he was preparing to import to Mexico when he heard a man yelling at him and

asking if he had a phone. Moran responded that he did but that it was a Mexican phone and would not work. The man then displayed a gun and told Moran to give him his Dodge Caravan. Moran asked the man not to take the vehicle because he needed it for work, but the man became angry and Moran feared he would shoot him. The man grabbed Moran's phone from his hand and got in the van. Moran testified that he had left the keys in the van and may have left it running. The man sped away in the van, throwing Moran's phone out the window as he went.

### B. The contemporaneous descriptions

Joel Hernandez gave a statement approximately two hours after the incident. He described the man he encountered as a Hispanic male, 5'9" tall, weighing approximately 230 pounds, with thick facial hair, and wearing a black hat. Hernandez testified that he saw the man for three to five minutes, but only saw him face to face for about one minute because he approached the man from behind.

Jacinto Ituarte testified variously that the man faced him for eight to ten seconds, and that they looked at each other for four to five seconds. He described the man as 240 pounds, a little bald, having a little facial hair and a medium complexion, and being in his thirties or forties.

Jaime Cortez testified that he saw the man's face for about ten seconds from forty to fifty feet away. He described him as a Hispanic male, six feet tall, and weighing 190 pounds. He did not notice any facial hair and stated that the hair on his head was short but not too short. He did not see the man wearing a hat.

Moran described the man as Hispanic, in his thirties or forties, and taller than Moran, who is 5'6" tall. He did not remember whether the man had any facial hair.

Based on these descriptions, the El Paso County Sheriff's Office issued a news release

describing the suspect as "a Hispanic male between 35 to 45 years old, medium complexion, approximately 240 pounds, and 5'9" tall."

Evidence accompanying a September 2016 mug shot of Abarca shows that Abarca was born in 1987 (and thus would have been in his late twenties at the time of the robbery), is 5'11" tall and, the time of the mug shot, weighed 200 pounds.

## C. The investigation

A variety of personnel from the El Paso County Sheriff's Office were dispatched to the scene. They obtained statements from the witnesses, including the physical descriptions noted above. They also learned that Moran's van was a silver Dodge Caravan with New Mexico license plates bearing the number MLN428. The officers canvassed the scene and found a car radio and amp on the ground, and a single shell casing in Ituarte's car. The officers also took possession of Ituarte's gun.

On March 24, 2015, a sheriff's deputy working the area of Anthony, New Mexico, heard a radio call about a suspicious vehicle. Along with other officers, he eventually found a silver Dodge Caravan with a Texas license plate bearing the number DP3B374.[2] A check of the vehicle's VIN showed that the plate did not match the vehicle, and that the vehicle had been stolen from El Paso County. Another officer who was dispatched to the location where the van was found was familiar with Abarca and knew that he lived about a tenth of a mile from that location. That officer contacted the El Paso County Sheriff's Office to provide Abarca's name as a possible suspect in the theft of the van.

---

[2] The officer testified that the plate number was DP3B379 but photographs of the recovered van show the plate number to be DP3B374.

El Paso law enforcement later learned that the Texas license plate found on the van matched a license plate on a Mitsubishi Eclipse that had been pulled over on March 20, 2015. The car was occupied by Marisela Gallegos and Michael Bannister, who claimed to own the car. A few days later, on March 23, a New Mexico state police officer was dispatched to assist an officer at a gas station. There he encountered a woman standing outside a white Mitsubishi bearing Texas license plates with the number DP3B374. The woman jumped into the car and tried to flee but could not because the car had a flat tire and was mounted on a jack. A check of the VIN showed that the vehicle had been stolen.

The contents of Moran's van were inventoried upon the van's return to El Paso County. Among those contents were some credit cards belonging to Michael Bannister. The van was also processed for latent fingerprints. One print that was found on the inside of the driver's side window matched Abarca's. Other prints found inside the van could not be matched to anyone but were excluded as having come from Abarca. Those prints also did not match Bannister.

**D. The identifications**

Hernandez was shown a photo lineup[3] containing Abarca's photograph but did not identify anyone. He also did not identify Abarca at trial when asked if he saw the man whom he encountered present in the courtroom. Ituarte similarly failed to identify Abarca from a photo lineup, but he did identify Abarca in the courtroom during trial. Ituarte explained that it was easier to identify Abarca in person because he could see the way he moved his forehead and his eyebrows.

Cortez was not shown a photo lineup but identified Abarca in court as the man he had seen.

---

[3] The lineup procedure is discussed in further detail below in the context of Abarca's challenge to the identification evidence admitted at trial.

Finally, Moran identified Abarca from a photo lineup and indicated at the time that he was 30% sure of his identification. Moran also identified Abarca at a suppression hearing and in the courtroom during trial. Abarca was wearing an orange jail outfit during the suppression hearing, but Moran affirmatively testified that he recognized him from the day of the offense.

### E. The legal proceedings

The primary issue in the court below was whether Abarca was the man who committed the aggravated robbery. Abarca filed a motion to suppress Moran's photo identification, which was denied, and also objected to certain identification evidence admitted at trial. The jury returned a guilty verdict following three days of testimony. The court entered a judgment of conviction on that verdict and sentenced Abarca to twenty-five years' confinement.

## II. DISCUSSION

Abarca raises ten issues on appeal, which we roughly group into four segments: first, he challenges the trial court's admission of the recording of Abarca's jail-call (Issues One through Five); second, he challenges the court's denial of his motion to suppress the photo identification made by Moran (Issue Six); third, he challenges the court's admission of Moran's and Ituarte's in-court identifications (Issues Seven and Eight); and, fourth, he challenges the court's admission of out-of-court statements from Marisela Gallegos claiming the statements violated the hearsay rule and the Confrontation Clause of the U.S. Constitution (Issues Nine and Ten).

We address each group of issues in turn.

### A. Standard of Review

The admission or exclusion of evidence is reviewed for abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex. Crim.

6

App. 2016). "Under this standard, the trial court's decision to admit or exclude evidence will be upheld as long as it was within the 'zone of reasonable disagreement.'" *Beham*, 559 S.W.3d at 478; *see State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005).

## B. Admissibility of the jail-call recording

In Issues One through Five, Abarca challenges the trial court's admission of the jail-call recording on a variety of grounds.

### 1) Underlying facts

State's exhibit 91 is a seven minute and fifty-eight second audio recording of a telephone call made from the El Paso County Jail using a PIN number assigned to Rudy Abarca. The caller is identified as "Rudy."[4] Jesse, one of the participants on the call, asks Abarca, "how much time?" to which Abarca responds, "I'm looking … they're trying to give me fifteen years." Abarca also states, "I'll do like fifty percent, so I'll do like seven and a half years. . . before I hit parole. . . . Hopefully they drop the time. They ain't got shit on me fool . . . all this shit they're trying to pin me, I can beat it but the most they can get me is for . . . ." Jesse then interjects stating "they're all accusations." Abarca then continues, "yeah then the most they can get me is for unlawful use of a vehicle. . . That's probably a year in TDC. . . . So hopefully I beat that shit and they hit me with that and I go do a year flat and come out on parole." Abarca then states, "If they offer me a two-piece, I'm gonna take it . . . If they offer me two, I'm takin' that shit." Jesse and Abarca also engage in banter about getting tattoos, hepatitis C, prison sex, and muscle-building. They make liberal use of cursing and racial epithets, and repeatedly call each other "fool."

---

[4] Abarca concedes in his brief that the voice on the recording is his.

### 2) Abarca's objections at trial

The State contends that at least some of Abarca's appellate complaints concerning the jail recording are not preserved for review. For this reason, we identify precisely what objections Abarca presented to the trial court.

Initially, the jail-call recording was played for the trial court outside the presence of the jury. When the court inquired about the recording's relevance, the State explained that Abarca's statement concerning unauthorized use of a motor vehicle places him in the stolen van. The State further explained that Abarca's statement concerning his willingness to plead guilty if offered two years is relevant as a statement against interest and an admission of guilt. The State further argued that, because the statement was not made to Abarca's attorney or an attorney for the State, it was not protected by any privilege or rule of evidence.

Abarca responded by objecting that his statements were not an admission of guilt but were merely his evaluation of the case and the evidence against him. More specifically, Abarca objected that his statement concerning "what he would be willing to take" was inadmissible under evidence rule 410 as evidence of plea negotiations. *See* TEX. R. EVID. 410. Abarca also objected to State's exhibit 91 on the ground that the recording could not be authenticated and that it was inadmissible under evidence rule 403 because the jury would be led to speculate concerning whether Abarca meant he would take a deal because he was guilty. *See* TEX. R. EVID. 403. Finally, Abarca objected that the additional voices on the recording presented hearsay and confrontation issues, and that the way the call participants talked—specifically, their use of "fool"—could be taken as improper character evidence.

After the court overruled these objections, Abarca inquired whether the entire recording

8

would be admitted. The court responded that "[t]he entire portion of the tape that we heard" would be admitted. Abarca then raised a relevance objection to the portion of the recording containing his statements concerning a fifteen-year sentence and parole in seven-and-a-half years. He also objected that the statement concerning unauthorized use of a motor vehicle was inadmissible under rule 403. Abarca then generally asserted that there were "issues" with rule 403, rule 410, and authentication. The court responded that it had already ruled.

After both sides had rested and closed, Abarca pointed out that only a portion of the jail call had been played for the jury. He asked for clarification from the trial court on whether other comments captured on the CD were likewise admitted even though they were not played in open court. As to those portions, Abarca pointed out that he had wanted to generally raise relevance and rule 403 objections. Particularly, he described a portion of the call talking about "lots of mustard n***er or something like that," and other portions that included discussions of him getting tattoos and avoiding hepatitis C while in jail. The trial court overruled Abarca's objections and reiterated that the entire conversation contained on the CD was admitted regardless of whether it was played for the jury.

**3)      Analysis**

In Issues One through Five, Abarca argues several differing aspects about the admissibility of portions of the jail-call recording as well as the recording as a whole. We address the arguments in turn.

**i.  Rule 410 argument**

In Issue One, Abarca argues that the recording contains statements made during plea negotiations, which are inadmissible under evidence rule 410. *See* TEX. R. EVID. 410. That rule

9

provides that "a statement made during plea discussions with an attorney for the prosecuting authority" is inadmissible against a defendant in a criminal trial who took part in the plea discussions "if the discussions did not result in a guilty or nolo contendere plea or they resulted in a later-withdrawn guilty or nolo contendere plea." TEX. R. EVID. 410(b)(4).

The State urges that Abarca preserved his rule 410 objection only in reference to the "two-piece" statement. While this is a close call, we believe that Abarca's rule 410 objection, taken in context, was sufficiently broad to encompass all of his statements concerning potential sentencing. In any event, the record demonstrates that the objection lacks merit.

Citing to the jail-call recording (State's exhibit 91), Abarca asserts that his statement concerning a fifteen-year sentence referred to an offer received from the State that had been communicated to him by his attorney. He also asserts, again without citation to the record, that his statement about taking a "two-piece" was a reference to his own counter-offer, which he says was communicated by Abarca to his attorney, who then relayed that counter-offer to the State.[5]

Nothing in the jail call, or anything else in our record, shows that the source of Abarca's statement, "they're trying to give me fifteen years," was a plea offer from the State. In fact, by its plain language, it more likely refers to the sentence the State was seeking to have imposed following a trial on the merits. "Trying to give me fifteen years" is simply not synonymous with "offering me fifteen years." Similarly, nothing in the record shows that Abarca's willingness to accept a two-year sentence was communicated to the State as part of any plea negotiations, or even

---

[5] Abarca states in his brief that his comments concerning parole and a charge for unauthorized use of a vehicle must have originated with discussions with his own attorney, hinting that the attorney-client privilege may be implicated. But Abarca also acknowledges that attorney-client privilege and rule 410 are distinct concerns and that only the latter is at issue here.

that it was communicated at all. On the contrary, Abarca's statement was that he would take two years *if it was offered*, which indicates both that the State had not made any such offer and that Abarca had not made any such counteroffer.

In short, the record does not support Abarca's contention that his statements in the jail call were statements "made during plea discussions with an attorney for the [State]." TEX. R. EVID. 410(b)(4). On its face, rule 410 does not apply. As noted by the Court of Criminal Appeals, "purported plea offers *or other statements to anyone other than an attorney for the prosecution*, . . . , *are not covered by Rule 410 . . . .*" *Monreal v. State*, 947 S.W.2d 559, 565 (Tex. Crim. App. 1997) (en banc) (quoting S. Goode, et al., *Guide to the Texas Rules of Evidence: Civil and Criminal* § 410.3 at 282 (2nd ed. 1993)) (emphasis by Court of Criminal Appeals). Abarca characterizes this language from *Monreal* as dicta. Regardless, it comports with the express language of the rule and our own understanding of that rule. *See Carter v. State*, No. 08-07-00192-CR, 2009 WL 2343725, at *8 (Tex. App.—El Paso July 31, 2009, pet. ref'd) (not designated for publication) (quoting *Monreal* with approval).[6]

Abarca urges that failing to apply rule 410 to his jail-call statements may lead to an obliteration of the rule's protections because an accused could not discuss a plea offer with family, friends, or others without taking the risk of making the statement admissible against him at trial. We disagree. It is not merely the fact that Abarca's statements were made to a third party that

---

[6] The San Antonio Court of Appeals has also adopted this interpretation of rule 410. *See Aekins v. State*, No. 04-13-00064-CR, 2013 WL 5948188 (Tex. App.—San Antonio Nov. 6, 2013) (mem. op., not designated for publication), *aff'd*, 447 S.W.3d 270 (Tex. Crim. App. 2014). The defendant in *Aekins* discussed a possible plea deal in a telephone call from jail to his wife. *Id.*, at *7. Citing *Monreal*, the court of appeals rejected the argument that the discussion was protected under rule 410: "The statements were not made to an attorney accountable to the prosecuting authority, nor were they were made to, or in the presence of, any attorney. Plea offers or other statements to anyone other than an attorney for the prosecution are not covered by Rule 410." *Id.*

11

removes them from the protections of rule 410. It is the fact that nothing in the record demonstrates that his statements were "made during plea discussions with an attorney for the prosecuting authority . . . ." TEX. R. EVID. 410(b)(4). Rule 410 is clear, as is the fact that it does not apply in this case.

In sum, we conclude that evidence of a plea offer, and Abarca's thoughts about taking said offer—presented in the form of the jail-call recording—do not fall within the parameters of rule 410. Having reached this conclusion, we need not address Abarca's additional arguments concerning exceptions to or waivers of that rule's protections.

Issue One is overruled.

### ii. Rule 401 and 403 arguments as to unauthorized use of a vehicle

In Issues Two and Three, Abarca asserts that Abarca's statements of plea discussions and his corresponding thoughts about pleading guilty to two years in prison were irrelevant and highly prejudicial. *See* TEX. R. EVID. 401, 403. We address the statements within the context of plea negotiations as well as alone as independent statements.

### a. Relevance and unfair prejudice

Abarca contends that the jail-call recording was inadmissible under evidence rules 401 and 403 because evidence of plea negotiations is not relevant to proving the elements of an offense and is highly prejudicial to a defendant. *See* TEX. R. EVID. 401, 403; *Bowley v. State*, 310 S.W.3d 431, 435 (Tex. Crim. App. 2010); *Canfield v. State*, 429 S.W.3d 54, 74 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd).

The State argues that Abarca did not preserve his rule 403 objection in relation to the statements concerning a fifteen-year sentence and the possibility of parole in seven-and-a-half

12

years. We agree. Abarca raised a rule 403 objection to admission of his statements that the most they could get him for was unauthorized use of a vehicle and that he would take "a two-piece." Thus, the assertion of rule 403 error is preserved in this context. But Abarca's objection to the statements concerning a fifteen-year sentence and parole in seven-and-a-half years was based only on relevance: "what they have offered him and what he might do on that is not relevant to this particular case in any way." For that reason, our consideration of those statements will be limited to their relevance.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence . . . ." TEX. R. EVID. 401. "Evidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence." *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004) (en banc). Relevant evidence is generally admissible. *See* TEX. R. EVID. 402. It may be excluded, however, if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. TEX. R. EVID. 403. Even so, "[r]ule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *see Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (en banc).

It is also significant that "[r]ule 403 does not exclude all prejudicial evidence[,]" but only evidence that is "unfairly" prejudicial. *Mechler*, 153 S.W.3d at 440. Indeed, all evidence is "likely [to] be prejudicial to one party or the other." *Davis*, 329 S.W.3d at 806. For this reason, the "unfair prejudice" contemplated by rule 403 "refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*; *see Mechler*, 153 S.W.3d at 440

13

("'Unfair prejudice' refers only to relevant evidence's tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged.").

A rule 403 analysis involves balancing:

(1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

The bulk of Abarca's argument is founded on the premise that the statements discussed above were made during plea negotiations with the State. But, as also discussed above, that premise is not supported by the record. Insofar as Abarca argues that the statements lack relevance and are unduly prejudicial because they contain plea negotiations, his arguments are overruled.

Issues Two and Three in part are overruled.

**b. Abarca's statement about his unauthorized use of a motor vehicle**

We turn next to an assessment of the admissibility of Abarca's statements independently of their characterization as plea negotiations. The portion of the jail-call recording in which Abarca states that the most he could be convicted for is unauthorized use of a vehicle has some relevance in that it tends to place Abarca in the stolen van. *See* TEX. R. EVID. 401. Given that the State had eyewitness testimony identifying Abarca as the robber, as well as evidence that his fingerprint was found inside the stolen van, this evidence may not have been crucial to the State's case. It did, however, provide another link between Abarca and the van. The evidence does not tend to suggest a decision based on an emotional or otherwise improper basis, nor does it have any tendency to

14

confuse or distract the jury from the main issue. On the contrary, it bears directly on the main issue—Abarca's identity as the robber. Finally, there is no indication that the jury was not equipped to evaluate the probative force of this evidence, and presentation of the evidence was neither inordinately time-consuming nor cumulative. *See id.*

The probative value of Abarca's statement concerning unauthorized use of a motor vehicle is not substantially outweighed by a danger of unfair prejudice. The trial court did not abuse its discretion by overruling Abarca's rule 403 objection to that evidence.

Moreover, Abarca's statement that he would be willing to accept an offer of two years has some relevance as tending to show a consciousness of guilt. *See Simpson v. State*, 181 S.W.3d 743, 749 (Tex. App.—Tyler 2005, pet. ref'd) (defendant's letter containing ambiguous statement concerning his guilt was relevant as providing "small nudge" toward determining guilt-innocence issue); *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.) (conduct by accused indicating consciousness of guilt is admissible as tending to prove he committed charged acts). It is not required that the statement conclusively prove Abarca's guilt or his acceptance of guilt. *See Stewart*, 129 S.W.3d at 96 (evidence need not, by itself, prove or disprove matter to be relevant).

Abarca argues that the statement is unfairly prejudicial because it impinges on the presumption of innocence. The cases on which he relies, however, involve situations where a jury was informed during trial that the defendant was engaged in plea negotiations. *See Blue v. State*, 41 S.W.3d 129 (Tex. Crim. App. 2000) (en banc); *Hayes v. State*, 484 S.W.3d 554 (Tex. App.—Amarillo 2016, pet. ref'd.). Neither case concerns a defendant's own statement, outside the context of plea negotiations, indicating an awareness of guilt.

15

In *Blue*, the trial judge informed prospective jurors that jury selection was delayed because the defendant was engaged in plea negotiations with the State. 41 S.W.3d at 130. The Court of Criminal Appeals held that this impermissibly tainted the defendant's presumption of innocence. *Id.* at 132. "A juror who knows at the outset that the defendant seriously considered entering into a plea agreement no longer begins with a presumption that the defendant is innocent." *Id.*

In *Hayes*, a court bailiff informed jurors during trial that the defendant and the State were discussing a plea agreement. 484 S.W.3d at 556. The court of appeals noted the appellant's argument that "the comment allegedly impugned the [defendant's] presumption of innocence," but the issue on which the appeal was decided was whether the bailiff's comment constituted evidence received and considered by the jury that was not admitted at trial. *See id.* at 556-57.

We reiterate that Abarca's expression of willingness to plead guilty in exchange for a two-year sentence was not made in the context of any plea negotiations. For this reason, this case is more akin to *Willis v. State*, No. 04-09-00349-CR, 2010 WL 2935772 (Tex. App.—San Antonio July 28, 2010, no pet.) (mem. op., not designated for publication), than to *Blue* or *Hayes*. The defendant in *Willis* wrote a letter to a police officer in which he stated that he was willing to enter a plea of guilty to a drug offense if the State dropped the "drug-free zone" allegation and reduced his sentence to five-years confinement. *Id.*, at *1. Like the jail-call recording in our case, the letter in *Willis* did not fall within the scope of rule 410. *See id.*, at *4.

In conducting a rule 403 balancing analysis, the court of appeals recognized that "[a] trier of fact could reasonably consider the content of Willis's voluntary communication as an admission of the crime charged." *Id.*, at *5. The letter was therefore probative on the issue of guilt. *Id.* The court further concluded that, because the letter bore directly on the defendant's guilt, it was

16

important to the State's case, it did not divert the jury's attention from the charged offense, and the time it took to present the evidence was negligible. *Id.* The trial court therefore did not abuse its discretion in admitting the letter over the defendant's rule 403 objection. *Id.*

We likewise conclude that Abarca's unsolicited statement that he would take a deal for two years is probative on the issue of his guilt, was important to the State's case, did not divert the jury's attention from the charged offense, and did not take an inordinate amount of time to present. The trial court did not abuse its discretion in denying Abarca's rule 403 objection to that evidence.

Issues Two and Three in part are overruled.

### iii.  Relevance of fifteen-year sentence and parole statements

As discussed above, Abarca did not assert a rule 403 objection in conjunction with his statements concerning a potential fifteen-year sentence and parole after serving half of that sentence. He did, however, object that those statements were not relevant. As to lack of relevance, we agree but further conclude that the evidentiary error was harmless.

Punishment is not an issue at the guilt-innocence phase of a criminal trial and should not be discussed by either party during that phase. *See Garcia v. State*, 887 S.W.2d 862, 877 (Tex. Crim. App. 1994) (en banc), *abrogated in part on other grounds by Hammock v. State*, 46 S.W.3d 889, 893 (Tex. Crim. App. 2001). Abarca's statements concerning his potential sentence and how much of that sentence he would likely serve were introduced during the guilt-innocence phase of his trial and were not relevant to any issue before the jury in that phase. *See id.* In fact, Abarca's potential sentence was never an issue before the jury because Abarca elected to have his punishment assessed by the court.   The evidence was therefore irrelevant and inadmissible. *See* TEX. R. EVID. 402 (irrelevant evidence is inadmissible).

17

The erroneous admission of evidence is non-constitutional error which must be disregarded unless it affected substantial rights. *See Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); TEX. R. APP. P. 44.2. "[S]ubstantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (internal quotation marks omitted). Stated conversely, "a substantial right is affected when the error has a substantial and injurious effect or influence in determining the jury's verdict." *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001) (en banc).

Our assessment of harm encompasses a review of the entire record. *Motilla*, 78 S.W.3d at 355. We consider "(1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error." *Gonzalez*, 544 S.W.3d at 373.

The statements concerning Abarca's potential sentence and the time he might actually serve were made in conjunction with other statements, which were properly admitted, indicating Abarca's consciousness of guilt. Other evidence supporting the jury's verdict and indicating Abarca's guilt includes positive identifications by three eyewitnesses and Abarca's fingerprint inside the stolen van. The sentencing statements were not emphasized, or even mentioned, by the State.[7] In fact, they appear to have played no part in the State's case other than being included in State's exhibit 91. We conclude, with fair assurance, that admitting the sentencing statements did

---

[7] The State played the recording during its closing but did not mention the 15-year or 7 1/2-year statements in its argument or otherwise call attention to them.

not influence the jury in this case. *See Motilla*, 78 S.W.3d at 355. The error is therefore harmless.

The remaining portion of Issues Two and Three are overruled.

### iv. Extraneous bad acts and character evidence

In Issue Four, Abarca contends that the trial court abused its discretion by admitting the jail-call recording in its entirety because it contains statements constituting evidence of bad character or extraneous bad acts. *See* TEX. R. EVID. 404. In Issue Five, he further contends that those same portions of the jail-call recording were inadmissible because of lack of relevance and that their probative value was substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 401, 403.

The particular content about which Abarca complains on appeal consists of banter between Abarca and others on the call concerning tattoos, hepatitis C, prison sex, and beating people up, as well as the use of vulgar language, racial slurs, and calling each other "fool." But Abarca's objections at trial were more narrowly drawn:

> And so they are talking about all these extraneous matters. I think some of the conversations there where he is saying "Fool" this and "Fool" that could be used against my client in a way that's not proper. I mean, it doesn't mean anything the way someone talks, and the way they express themselves. But given the way they are talking, and the way their conversation that they are having, it could be used – I mean, essentially it would be improper character evidence if they take it for a bad purpose.
>
> . . .
>
> You know, all these conversations about "What's up fool? Tired of ducking and dodging me," or this and that, that's not relevant to this particular case.

At the time the recording was offered into evidence, Abarca did not draw the trial court's attention to any evidence of racial slurs, vulgar language, or what he now characterizes as extraneous bad acts. The omission is particularly significant in this case because the jail-call

recording is of poor quality and much of its content is very hard to decipher. The trial court itself expressed difficulty in understanding what the participants were saying: "[W]e are going to have a problem with the jury hearing it; I can't make it out. It's garbled." In fact, the court listened to the recording three times before it was able to understand Abarca's statement concerning unauthorized use of a motor vehicle.

The day after the close of evidence, however, Abarca noted that the trial court had admitted the entire jail-call recording but that the entire recording had not been played for the jury. Abarca also clarified that the recording had not been played in its entirety for the court when it was being reviewed outside the presence of the jury. Abarca commented that "we stopped listening right around the time when he had just talked about it." The "it" being referred to then was the call-portion stating, "If they offer me a two piece, I'm going to take it. I don't know what to tell you." Abarca further described that the unplayed portion of the recording contained comments about tattoos and hepatitis C, and he asked the court whether those additional portions would be allowed in evidence. The court reaffirmed that the entire conversation that was contained on the CD was what had been admitted. Abarca then acknowledged, "So the Court was not aware, and I had not made the Court aware of what was additionally on it."

It was incumbent upon Abarca to specifically inform the trial court of the portions of the recording he considered to be objectionable under rules 403 and 404. *See* TEX. R. APP. P. 33.1(a) (requiring objection "with sufficient specificity to make the trial court aware of the complaint"). In the absence of that specificity, the trial court was deprived of the opportunity to address and, if necessary, act on the concerns Abarca now raises. In addition, Abarca's objections specifically identifying statements concerning tattoos and hepatitis C were not raised until after the close of

20

the evidence. By failing to assert those objections at the time the recording was admitted, Abarca again deprived the court of the opportunity to effectively consider and act on them. *See id.* (requiring timely objection).

We conclude that Abarca's assertion of evidentiary error in admitting the portions of the jail-call recording including vulgar language and racial slurs and banter relating to tattoos, hepatitis C, prison sex, and beating people up are not preserved for review. *See id.* The only asserted error preserved for review by a timely and specific objection is that the call participants' use of the term "fool" is irrelevant and constitutes inadmissible character evidence. *See* TEX. R. EVID. 401 and 404. We consider these arguments in reverse order.

### a. Rule 404 and the term "fool"

Rule 404 prohibits the use of evidence of a person's character or character trait "to prove that on a particular occasion the person acted in accordance with the character or trait." TEX. R. EVID. 404(a). We fail to see, and Abarca does not explain, how the mere use of the term "fool" in the joking manner that is apparent from the recording constitutes any evidence of Abarca's character, good or bad. And nothing in the record supports a conclusion that the portions of the recording including that term were offered to prove that Abarca acted in accordance with any character trait on the occasion in question. *See id.* Those portions of the recording simply do not implicate rule 404.

Issue Four is overruled.

### b. Rule 401 and the term "fool"

Concerning Issue Five, we agree that the use of the term "fool" among the participants in the jail call is not relevant because it does not tend to make any fact of consequence in the case

21

more or less probable. *See* TEX. R. EVID. 401. But any error in admitting that evidence is not reversible.

Again, the error is non-constitutional and must be disregarded if, after examining the record as a whole, we have fair assurance that it did not influence the jury, or had but a slight effect. *See Gonzalez*, 544 S.W.3d at 373; *Motilla*, 78 S.W.3d at 355; TEX. R. APP. P. 44.2.

The evidence supporting the jury's finding of guilt is recited above. In addition to that evidence, our review of the jail-call recording reveals that the term "fool" is used by Abarca and others in a teasing manner. Except to the extent that the jury was able to discern the use of that term from that recording, the term was not used in front of the jury either in the course of questioning or in jury argument.[8] We have ample assurance that any error in admitting those portions of the recording including that term did not influence the jury in this case. *See Motilla*, 78 S.W.3d at 355.

Issue Five is overruled.

### C. Denial of Suppression of identification made by Moran

In Issue Six, Abarca argues that the trial court abused its discretion by not suppressing evidence of Moran's pretrial identification of him in a photo lineup.

#### 1) Underlying Facts

Prior to trial, the trial court held a hearing on Abarca's motion to suppress identification. Detective Rafael Chavez and Sergeant Jerome Washington of the El Paso County Sheriff's Office testified for the State about a photo lineup administered to complaining witness Moran, as well as

---

[8] The State played the recording during its closing but did not mention the use of the term "fool" in its argument or otherwise call attention to that term.

22

the written policies and procedures of the department which they followed relative to the circumstance. Following procedures, the testimony established that once a suspect was identified, whether by witnesses or fingerprints or some other means, a photo lineup was prepared based on that suspect's photograph and photographs of other individuals with similar features to show and present to the victim. Detective Chavez confirmed that the suspect's photograph was printed, along with the photographs of five other "fillers" who matched the suspect as closely as possible by gender, facial hair, and "anything that can make them all look similar to one another." Detective Chavez gave photos to Sergeant Washington, who then shuffled them and placed them in individual folders which were then numbered one through six.

Following procedures, a person who is not the person presenting the lineup shuffled the folders outside the presence of the presenter so that the presenter did not know which folder contained the suspect's photograph. The presenter may either be "blind," meaning he has no indication of any details about the case or the suspect, or "blinded," meaning he has some knowledge of the case. In any event, the presenter was situated so that he cannot see the photographs as the viewer looks at them. This positioning is followed so as to avoid giving the viewer any unintentional cues concerning which photograph belonged to the suspect. Two additional folders, numbered as seven and eight, were included but contained no photographs. These additional folders were not given to the viewer; but their purpose served to give the illusion that there are more choices so that the viewer did not feel compelled to make an identification solely from among the first six folders.

Detective Chavez testified that the department had identified a suspect based on information received from Dona Ana Sheriff's Office detectives and from fingerprints recovered

from the victim's vehicle. In short, Detective Chavez generated the photo lineup presented to Moran based on the suspect identified during the investigation, *i.e.*, Abarca. He gave the photographs to Sergeant Jerome Washington, who shuffled them outside of Detective Chavez's presence. Detective Chavez then presented the lineup to Moran. Detective Chavez knew who the suspect was and that his photograph was included in the lineup, but he did not know which folder contained that photograph.

Sergeant Washington testified that a viewer is not permitted to look at the photographs for a "super long" time; he allows ten to fifteen seconds per photograph. If that time is exceeded, Washington tells the viewer that they are going to go on and that they can come back to that photograph. The goal is to prevent the viewer from fixating on a photograph, while also not causing him to feel rushed. Detective Chavez, however, testified that he allowed Moran as much time as he needed before handing him the next folder. In the meantime, Detective Chavez just sat and waited without making any suggestion to Moran. Detective Chavez estimated that the entire process took fifteen to twenty minutes. Moran similarly estimated that it took him fifteen to twenty minutes to look at all of the folders.

After Moran identified the photograph in folder four, Detective Chavez had him complete the lineup and then had him document his degree of certainty on the photograph he chose. Moran testified at the suppression hearing that Detective Chavez did not say anything, tell him who the suspect was, or make any kind of suggestion to him during the photo lineup. He confirmed that he recognized Abarca as the person who had taken his truck, and he marked 30 percent certain on the lineup. He explained, "I did not want to put 100 percent, because I didn't want to harm somebody that would be innocent."

24

The same photo lineup was shown to Ituarte, but this time the detectives' roles were reversed. Detective Chavez shuffled the photographs and Sergeant Washington presented the lineup. Ituarte did not identify anyone from the photo lineup because "everybody looked the same."

### 2) Applicable Law

A pretrial identification procedure may be impermissibly suggestive because of the procedure employed, "for example by police pointing out the suspect or suggesting that a suspect is included in the line-up or photo array." *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995) (en banc). Or the content of a photo lineup itself may render it impermissibly suggestive, for example, "if the suspect is the only individual closely resembling the pre-procedure description." *Id.*

The appellant bears the burden of establishing by clear and convincing evidence that a pretrial identification procedure was impermissibly suggestive. *Balderas v. State*, 517 S.W.3d 756, 792 (Tex. Crim. App. 2016); *Barley*, 906 S.W.2d at 34. The reviewing court considers the evidence both at the pretrial suppression hearing and at trial, *Balderas*, 517 S.W.3d at 792, bearing in mind that the trial court is the sole trier of fact at the suppression hearing and the sole judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000) (en banc).

### 3) Analysis

#### i. Suggestibility of the photo lineup procedure

Abarca contends that the procedure used for the photo lineup shown to Moran was impermissibly suggestive because Moran was allowed to look at the photographs for fifteen to

twenty minutes before selecting one, and that it was unlikely that Detective Chavez did not make some suggestion to him during that time. As a preliminary matter, the record does not show that Moran looked at the photographs for fifteen to twenty minutes before selecting one. Rather, Detective Chavez testified that the entire process took that amount of time, and Moran testified that that was the amount of time he spent looking at all of the folders. Some of that time was spent looking at photographs *after* Moran identified Abarca from the photograph in folder four, because Detective Chavez still had Moran review the remaining photographs.

Abarca contends that Detective Chavez allowed Moran to fixate on the photos for fifteen to twenty minutes before making his selection, and that this length of time violated the El Paso County Sheriff's Office's lineup procedures. That contention, however, is not supported by the record. At the suppression hearing, Detective Chavez testified that the entire process itself from the start took fifteen to twenty minutes. And during that time, Chavez described that he administered several departmental procedures.

Chavez first explained to Moran what was going to happen to include use of an admonishment form that contained instructions about the process. Those instructions informed Moran that a series of photographs would be shown one at a time, that the suspect may or may not be in the array presented, that the presenting officer does not know what position a suspect may be placed in, and that Moran must look at each photograph. Another instruction informed Moran that if he did make an identification, he would be asked to describe his level of certainty.

Following the admonishments, Detective Chavez showed each photograph in the folders one at a time. When asked for details, Detective Chavez stated: "I show him the folders one at a time and allow him to take as much time as he needs before I hand him the next one. . . . Then he

26

looked through the photos, and he made an identification." Chavez testified that Moran recognized the person in the photograph that was in folder No. 4. As required, he next asked Moran how certain he was and had him view the rest of the photos, photos five and six. Lastly, Chavez asked Moran to initial and document his certainty on the actual photograph.

Contrasted with Detective Chavez's testimony about his administration of the Moran identification, Sergeant Washington testified at trial that the department's procedure did not allow a viewer to look at the photographs for a "super long period of time." When asked how long was too long, Sergeant Washington responded that no time clock was used but *he* would say that after ten to fifteen seconds per photograph he would show another photograph. He explained that people may start to fixate on a picture too long because of similar features, or not, and the goal is not to rush the viewer, but at the same time, not allow a person to stare "for a super long period."

On review, we conclude that Abarca has not established that a total viewing period of fifteen to twenty minutes for the entire process including administering instructions and documenting certainty violated the Sheriff's Office's "super long time" policy or that the lineup procedure was impermissibly suggestive merely because it took that period of time. He also has not demonstrated any violation of the purpose for imposing time constraints on a photo lineup. The record does not reflect how long Moran viewed any particular photograph or the photograph in folder four in particular. There is simply no indication that Moran identified Abarca's photograph because he fixated on it.

The record also does not support Abarca's allegation that Detective Chavez must have made some suggestion to Moran while Moran was viewing the photographs. While Detective Chavez knew who the suspect was, he did not know which folder contained the suspect's

27

photograph. The detective testified that he simply waited while Moran viewed the photographs, and Moran testified that the detective did not make any suggestion to him. It was within the province of the trial court, as trier of fact at the suppression hearing, to determine the credibility of the witnesses. *Ross*, 32 S.W.3d at 855. In the absence of findings of fact, we assume that the trial court gave credence to the testimony that supports its ruling. *See Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). We therefore assume that the trial court accepted Detective Chavez's and Moran's testimony that the detective did not make any suggestion to Moran concerning who the suspect was or which photograph to choose.

This case is distinguishable from *State v. Diamos*, No. 08-16-00322-CR, 2018 WL 5861808 (Tex. App.—El Paso Nov. 9, 2018, pet. ref'd) (not designated for publication), on which Abarca relies. The trial court in *Diamos* made express findings that the person who viewed the photo lineup (1) knew that the detective who presented the lineup knew who the suspect was, (2) first chose a photograph of someone other than the suspect, and (3) after continued conversation with the detective, chose the suspect's photograph. *Id.*, at *4. None of these factors is present in the case before us; *Diamos* is inapposite.

Abarca has not sustained his burden of establishing by clear and convincing evidence that the procedure used in presenting the photo lineup to Moran was impermissibly suggestive. *See Balderas*, 517 S.W.3d at 792; *Barley*, 906 S.W.2d at 34.

We next consider whether the content of that lineup was impermissibly suggestive.

### ii. Suggestibility of the photo lineup content

Abarca contends that the photo lineup shown to both Moran and Ituarte was impermissibly suggestive because it was not based on the descriptions given by witnesses at the time of the

offense. Instead, the El Paso County Sheriff's Office had identified Abarca as a suspect based on information from a New Mexico law enforcement officer, and thereafter, compiled the photo array based on Abarca's appearance. Abarca does not contend that the five other individuals pictured in the photo lineup were dissimilar to him in appearance, only that all of them (himself included) were dissimilar in appearance to the description given by witness statements.

The argument raised here by Abarca has previously been considered by the Texarkana Court of Appeals. *See Wallace v. State*, 75 S.W.3d 576 (Tex. App.—Texarkana 2002), *aff'd*, 106 S.W.3d 103 (Tex. Crim. App. 2003). The photo lineup at issue in *Wallace* was prepared after a suspect had been identified and was based on that suspect's appearance. *Id.* at 584. Wallace asserted that this was error because "the photographic array did not contain anyone matching the original description given by the witnesses." *Id.* The court of appeals rejected this assertion, noting that a suspect was identified before the array was prepared and stating, "[g]iven the state of the investigation at the time, there was no obligation to prepare a lineup fitting a description of someone not a suspect." *Id.* at 584-85.

The Court of Criminal Appeals has also recognized that "[t]he mere fact that the lineup participants did not perfectly match the witness' prior physical description of the robber does not render the lineup impermissibly suggestive." *Cooks v. State*, 844 S.W.2d 697, 732 (Tex. Crim. App. 1992) (en banc). The court in *Cooks* stated, "it is more important, for purposes of avoiding suggestive procedures, that appellant did not somehow appear conspicuous among the other participants." *Id.* The court concluded that, because there was no evidence that the appellant in that case "stood out as the likely candidate among the others in the lineup[,]" the lineup was not impermissibly suggestive. *Id.*

29

There is no contention in this case that the five "fillers" in the photo lineup did not closely resemble Abarca (and each other). In other words, there is no evidence that Abarca "stood out as the likely candidate" or was in some manner "conspicuous among the other participants." *See id.* Thus, even if the photo lineup was comprised of men who differed in appearance from Moran's and Ituarte's original descriptions, there is nothing about the photographs that would have impermissibly suggested that they identify Abarca rather than one of the other five. Indeed, Ituarte did not identify anyone from the lineup.

Abarca has not sustained his burden of establishing by clear and convincing evidence that the content of the photo lineup presented to Moran and Ituarte was impermissibly suggestive. *See Balderas*, 517 S.W.3d at 792; *Barley*, 906 S.W.2d at 34.

Issue Six is overruled.

**D. Admissibility of the in-court identifications**

In Issues Seven and Eight, Abarca repeats a portion of his argument against the admissibility of the photo-line-up identification as presented in Issue Six. As to Issues Seven and Eight, however, Abarca argues that the trial court abused its discretion by admitting Moran's and Ituarte's in-court identifications by asserting that their in-court identifications followed impermissibly suggestive out-of-court photo lineups.

**1) Admissibility of in-court identification**

"An in-court identification is inadmissible when it has been tainted by an impermissibly-suggestive pretrial photographic identification. The test is whether, considering the totality of the circumstances, the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Ibarra v. State*, 11

S.W.3d 189, 195 (Tex. Crim. App. 1999) (internal quotation marks omitted).

> [I]f the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure, subsequent identification testimony will be deemed "reliable," "reliability [being] the linchpin in determining the admissibility of identification testimony."

*Id.* (quoting *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988)).

Admissibility of an in-court identification is thus subject to a two-step analysis. The court must first determine "whether the out-of-court identification procedure was impermissibly suggestive," and then "whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification." *Barley*, 906 S.W.2d at 32–33; *see Balderas*, 517 S.W.3d at 792 ("If the court determines that a pretrial identification procedure was impermissibly suggestive, it then assesses the reliability of the identification under the totality of the circumstances.").

The first step of the analysis underlying Abarca's challenges to Moran's and Ituarte's in-court identifications corresponds to the inquiry underlying his challenge to Moran's pretrial photo lineup identification—was the photo lineup procedure, or the content of the lineup itself, impermissibly suggestive?

### 2) Analysis

As noted above, admissibility of an in-court identification is subject to a two-step analysis, the first step being to determine "whether the out-of-court identification procedure was impermissibly suggestive . . . ." *Barley*, 906 S.W.2d at 32–33; *see Balderas*, 517 S.W.3d at 792. Proceeding to the second step depends on the resolution of the first step: "*If* the court determines that a pretrial identification procedure was impermissibly suggestive, it *then* assesses the reliability of the identification under the totality of the circumstances." *Balderas*, 517 S.W.3d at 792 (emphasis added).

31

Because we conclude that the photo lineup was not impermissibly suggestive, we need not engage in the second step of the analysis. The trial court did not abuse its discretion by admitting Moran's and Ituarte's in-court identifications of Abarca. *See Cooks*, 844 S.W.2d at 732 ("In the absence of impermissibly suggestive pretrial procedures, in-court identification testimony is always admissible.").

Issues Seven and Eight are overruled.

### E. Admissibility of testimony from Marisela Gallegos

### 1) Hearsay

In his ninth issue, Abarca argues that the trial court abused its discretion by admitting certain evidence in violation of the hearsay rule. A former Anthony Police Department officer testified outside the presence of the jury that he encountered Abarca in the presence of Marisela Gallegos twice in 2014. The first encounter occurred when Abarca and Gallegos were involved in a theft from a Dollar General store. Both were issued citations but failed to appear in court, so warrants were issued for their arrest. The second meeting occurred during a traffic stop when the two were arrested on the outstanding warrants.

The officer testified that, on the first occasion, Abarca and Gallegos both told him that they were boyfriend and girlfriend. On the second occasion, neither Abarca nor Gallegos made any statements to him. The only evidence that was actually put before the jury was the officer's testimony that he had encountered Abarca with Gallegos, and that they had both stated that they were boyfriend and girlfriend.

Abarca contends that Gallegos's statements concerning her identity and her relationship with Abarca are hearsay because they are out-of-court statements offered for the truth of the

32

matters asserted. *See* TEX. R. EVID. 801(d). There is, however, no out-of-court statement by Gallegos concerning her identity. The officer merely testified that he had encountered her with Abarca. He did not testify concerning how he knew who she was. There being no hearsay, there is no hearsay violation.

The State urges that the statement that Abarca and Gallegos were boyfriend and girlfriend is not inadmissible hearsay because it was not offered to prove the truth of the matter asserted. Other evidence linked Gallegos to a Mitsubishi whose license plate was found on Moran's van. Gallegos was also linked to Michael Bannister, whose credit cards were found inside the van. The State asserts that its purpose in offering the boyfriend/girlfriend statement was not to prove that Abarca and Gallegos were, in fact, boyfriend and girlfriend. Rather, the statement was offered to establish a link between Abarca and Gallegos which, in turn, would establish a link between Abarca and the stolen van, *i.e.*, the license plate.

Even accepting that the statement was not offered to prove that Abarca and Gallegos were boyfriend and girlfriend, it is apparent that the statement was offered to prove that they had *some* relationship to support the implication that Abarca was involved in placing the license plates from a car associated with Gallegos on the stolen van. The line the State attempts to draw is too fine to warrant the conclusion that the statement was not offered to prove the truth of the matter asserted.

Nevertheless, the State also points out that a statement is not hearsay if it is offered against an opposing party who manifested that he adopted it or believed it to be true. *See* TEX. R. EVID. 801(e)(2)(B); *Paredes v. State*, 129 S.W.3d 530, 534 (Tex. Crim. App. 2004); *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999) (en banc). Abarca, as well as Gallegos, stated that the two were boyfriend and girlfriend. Because Abarca adopted Gallegos's statement concerning

33

their relationship, that statement is not hearsay. *See Paredes*, 129 S.W.3d at 534; *Trevino*, 991 S.W.2d at 853. And Abarca's own statement concerning the relationship between the two is not hearsay because it constitutes the statement of a party opponent. *See* TEX. R. EVID. 801(e)(2)(A) (statement is not hearsay if offered against opposing party and made by that party).

Abarca has not established that the trial court abused its discretion by overruling his hearsay objection to the officer's testimony concerning the relationship between Abarca and Gallegos.

Issue Nine is overruled.

### 2) Confrontation Clause

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI; *see Crawford v. Washington*, 541 U.S. 36, 42 (2004). To protect this right, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59; *see De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008). Once a defendant raises a Confrontation Clause objection, the State bears the burden to establish either that the evidence does not contain testimonial hearsay statements or, if it does contain testimonial hearsay statements, that those statements are nevertheless admissible under *Crawford*. *De La Paz*, 273 S.W.3d at 681.

Abarca contends in his tenth issue that evidence of Gallegos's statement concerning her relationship with Abarca violates the Confrontation Clause because that statement was made

34

during a police encounter,[9] Gallegos did not testify at trial, and Abarca did not have a prior opportunity to cross-examine her. *See Crawford*, 541 U.S. at 59; *De La Paz*, 273 S.W.3d at 680.

"Generally speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *De La Paz*, 273 S.W.3d at 680; *see Davis v. Washington*, 547 U.S. 813, 822 (2006). We cannot read this standard in a way that divorces "to establish or prove past events" from "potentially relevant to later criminal prosecution." Rather, proof of past events is logically sought in the context of a particular criminal investigation.

Gallegos's boyfriend/girlfriend statement was made to a police officer at the time when Gallegos was suspected of theft from a Dollar Store and was issued a citation for that offense. The circumstances thus indicate that the primary purpose of the officer's interaction with Gallegos was to establish past events potentially relevant to a later criminal prosecution for theft. However, the circumstances also establish that the officer had no purpose whatsoever to establish or prove past events potentially relevant to a criminal prosecution for the aggravated robbery of Moran. The officer's encounter with Gallegos occurred in 2014. The aggravated robbery occurred in March 2015.

We conclude that the boyfriend/girlfriend statement is not testimonial in the context of Abarca's prosecution for aggravated robbery. Its admission therefore does not violate the Confrontation Clause.

---

[9] Abarca argues that statements were made during two police encounters but the record is clear that neither Abarca nor Gallegos made any statements to the officer during the second encounter.

In the alternative, we conclude that any error in admitting that statement is harmless.

> In determining specifically whether constitutional error under *Crawford* may be declared harmless beyond a reasonable doubt . . . the following factors are relevant: 1) how important was the out-of-court statement to the State's case; 2) whether the out-of-court statement was cumulative of other evidence; 3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and 4) the overall strength of the prosecution's case. . . . [T]he reviewing court must ask itself whether there is a reasonable possibility that the *Crawford* error moved the jury from a state of non-persuasion to one of persuasion on a particular issue. Ultimately, after considering these various factors, the reviewing court must be able to declare itself satisfied, to a level of confidence beyond a reasonable doubt, that the error did not contribute to the conviction before it can affirm it.

*Langham v. State*, 305 S.W.3d 568, 582 (Tex. Crim. App. 2010) (quoting *Scott v. State*, 227 S.W.3d 670, 690-91 (Tex. Crim. App. 2007)).

Gallegos's statement about the nature of her relationship with Abarca had little importance to the State's case. While the statement connected Gallegos and Abarca, that connection was also established by the police officer's testimony that he twice encountered them together. And insofar as the statement supported a chain of inferences connecting Abarca to the stolen van, the State presented ample direct evidence of that connection—Abarca's fingerprint was found inside the van and Moran, from whom the van was stolen, identified Abarca as the robber on three separate occasions. Two other eyewitnesses also identified Abarca as the perpetrator. Finally, Gallegos's statement is cumulative of Abarca's own statement that the two were boyfriend and girlfriend.

We find no reasonable possibility that any error in admitting Gallegos's statement moved the jury from a state of non-persuasion to one of persuasion on the issue of Abarca's identity as the robber. *See Langham*, 305 S.W.3d at 582. On the contrary, we are satisfied, to a level of confidence beyond a reasonable doubt, that the error did not contribute to Abarca's conviction. *See id.*

36

Issue Ten is overruled.

## III. CONCLUSION

The judgment of the trial court is affirmed.


GINA M. PALAFOX, Justice

January 27, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)

37