

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### No. PD-1168-07

### OSCAR PENA DE LA PAZ, Appellant[1]

### v.

### THE STATE OF TEXAS

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## IN CAUSE NO. 11-06-00146-CR FROM THE ELEVENTH COURT OF APPEALS
## NOLAN COUNTY

**HOLCOMB, J., delivered the opinion of the Court, in which MEYERS, PRICE, JOHNSON, HERVEY, and Cochran, JJ., joined. KEASLER, J., concurred in the result. KELLER, P.J., and WOMACK, J., dissented.**

The trial court admitted certain hearsay evidence over appellant's objection that its admission would violate his Sixth Amendment right to confront the witnesses against him. On direct appeal, the court of appeals held that the trial court did not err in admitting the evidence. We now reverse

---

[1] The court of appeals wrote appellant's surname as "Delapaz," but the record reflects that appellant writes his surname as "De La Paz."

and remand.

On October 18, 2005, a Nolan County grand jury returned an indictment charging appellant with two counts of aggravated sexual assault of a child under Texas Penal Code § 22.021(a)(1)(B)(i). Count one of the indictment alleged that appellant penetrated the child's female sexual organ with his finger, and count two alleged that he penetrated her sexual organ with his penis.

On March 27, 2006, the State brought appellant to trial before a petit jury on his plea of not guilty. At the guilt stage of the trial, the State called six witnesses: Angie Medina, Tonya Sides, Matt Counts, Les Soles, Pat Rollins, and Michelle Johnson. The State also offered in evidence numerous exhibits. Appellant called four witnesses: Angie Medina, Melissa Duran, Irene De La Paz, and himself.

Angie Medina, when called to the witness stand by the State and, later, by appellant, testified that: (1) she was 25 years old and resided with her five children at 1403 Hughes Street in Sweetwater; (2) on the day in question, Saturday, May 14, 2005, appellant – her longtime boyfriend and the biological father of her children – also resided with her and her children at that address; (3) her children included three girls (K.D., C.D., and F.D.) and two boys (M.D. and O.D.); (4) on the day in question, K.D. was seven years old, C.D. was six years old, M.D. was six years old, O.D. was four years old, and F.D. was two years old; (5) on that day, at 3:00 p.m., she left her children at home alone with appellant while she accompanied her mother and niece to a nearby Wal-Mart store; (6) she returned from the Wal-Mart store at about 3:50 p.m. and found the front door locked; (7) she knocked on the door, and appellant opened it; (8) she entered the residence, put her purchases on a table, and then went back outside to check on the children, who were all playing there; (9) she then went back inside the residence to use the bathroom; (10) appellant accompanied her into the

bathroom, and the two of them conversed there; (11) appellant told her that, while she was gone, he had bathed the children; (12) appellant also "talk[ed] about what would happen if one of the daughters got molested"; (13) she and appellant then heard a knock at the front door; (14) appellant went to the front door and opened it, while she remained in the bathroom; (15) she "heard [appellant] saying, 'I told you not to be playing outside'"; (16) she then left the bathroom, at which point appellant told her that K.D. was bleeding "at . . . her middle spot"; (17) appellant also "said that [K.D.] had told him there was a black guy"; (18) she examined K.D. and found bloody toilet tissue in her underwear; (19) she removed the bloody tissue from K.D.'s underwear and "put some more . . . in it to make it stop bleeding"; (20) she asked K.D. what had happened to her, but K.D. would not say; (21) she (i.e., Medina) then telephoned her mother to ask for a ride to the local hospital; (22) appellant "didn't want [her] to take [K.D.] to the hospital," however, because "he was afraid that . . . they would get the kids taken away"; (23) appellant was worried specifically that "the cops" and "CPS would get involved"; (24) she told appellant that she "had to take [K.D. to the hospital] because she was bleeding a lot"; (25) her mother drove her and K.D. to the emergency room of the local hospital; (26) while at the hospital, she telephoned appellant back at their residence in order "to check up on the kids"; (27) she spoke with appellant briefly at that time, and then he put six-year-old C.D. on the telephone; (28) she could hear appellant, in the background, coaching C.D. to tell her that K.D. had fallen out of a tree; (29) K.D. was later transferred to a hospital in Abilene; and (30) K.D. was released from the hospital in Abilene on Tuesday, May 17, 2005. Medina also testified that, in April 2005, appellant had caught her having sexual intercourse with another man.

State's witness Tonya Sides testified that: (1) she was a child-abuse investigator and certified peace officer employed by the Nolan County District Attorney's Office; (2) on May 14, 2005, she

was called to the Rolling Plains Hospital in Sweetwater to investigate a possible case of child abuse; (3) while at the hospital, she spoke with Angie Medina and learned that Medina had given consent for a police search of her residence at 1403 Hughes Street; (4) she then drove to Medina's residence and participated in a search of it; (5) when she arrived at the residence, appellant, appellant's mother, and "a few" of his children were there; (6) during the search, she found a pile of wet, bloodstained clothing in the bathroom; (7) she also found "some toilet tissue in the trash can that had blood on it"; (8) while at the residence, she "requested that [appellant] go to the police department and talk with [the police] about [K.D.'s] injuries," and appellant agreed to do so; (9) later that day, while talking with appellant at the police station, she explained to him that he was not under arrest and that he was free to leave at any time; and (10) appellant then gave a statement, which was reduced to writing and signed by him.

Appellant's written statement, admitted in evidence as State's Exhibit Number One, read as follows:

> "Angie and I were in the house. Angie was in the restroom and I was in the kitchen fixing a sandwich. While I was fixing the sandwich Angie said, 'Who's knocking on the front door?' I told her that I didn't know. I went to the front door and nobody was there. I heard somebody start knocking at the back door. I went to the back door and saw [K.D.] standing there. She had her hand out and I could see blood on the tips of her fingers. [K.D.] told me she was bleeding. I asked her where she was bleeding from and she told me 'down there.' I pulled out her shorts and could see blood. Angie asked what was going on and I told her. Angie called her mom and asked her to take them to the doctor. We asked [K.D.] what happened and she just told it was a black boy. I asked her which black boy and [K.D.] told me that she did not know. I asked her what happened and she just said it was a black boy. [C.D.] told me that [K.D.] had fell out of a tree. [K.D.] told me that she didn't fall out of a tree [and that] it was a black boy. Angie's mom showed up and they took [K.D.] to the doctor."

Sides testified further that: (11) on May 17, 2005, she drove back to the residence at 1403

Hughes Street and placed appellant under arrest; (12) she transported him to the Nolan County Jail, where she advised him of his *Miranda*[2] rights and where he voluntarily gave a second statement, which was different from his first statement; (13) appellant's second statement was also reduced to writing and signed by him; and (14) she did not coerce appellant or promise him anything in return for his second statement.

Appellant's second written statement, admitted in evidence as State's Exhibit Number Two, read as follows:

> "On Saturday, my wife went to the store with her mother. She left me with four of my kids. I was going to take them a bath. I put the two girls, [C.D.] and [K.D.], in the bath. I told the boys to wait for the girls to finish so they could take a bath. I had to put shampoo on their hair and around their neck and arm pits and arms. They were jumping around and stuff in the tub. [K.D.] had soap in her eyes and she was crying. I was like mad. I reached down by her legs and pulled her hard. I did not have this planned. I didn't plan to go to her private. I guess that is when I cut her open. I had seen blood. When I grabbed her I could feel part of her private. After I seen blood, it scared me. So I got them out of the tub and I cleaned her up. I told [C.D.] to go in the other room and change because I didn't want her to see it. I used toilet paper to clean her up. I got her under clothes and I put them on her while we were in the restroom. I told her to walk out like that and change into her other clothes. From there, they got dressed and I combed their hair. I told them to play outside. I was scared. I didn't want to end up in a place like this. I didn't know what to do. After that, that is when they went out to play and I took the boys a bath. My wife got home and we went into the restroom. [K.D.] was knocking on the front door. My wife asked who it was and I went to the back door and I opened it and saw blood on [K.D.'s] hands. She was telling me that she was bleeding from down their [sic]. From there, we went to the room and started cleaning her and my wife told me she was going to call her mom and take her to the doctor. I never told her not to call the police. The only thing I did, was get scared when I seen the blood from my little girl and I told her not to tell what happened. My wife pushed toilet paper in my daughter's private. I love my kids a lot. I love my daughter and I would never do anything to hurt her. What happened was an accident and it wasn't anything I planned. I love them all with all my heart. I wished none of this happened."

State's witness Matt Counts testified that: (1) he was an officer in the Sweetwater Police

---

[2] *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

Department; (2) on the afternoon of May 14, 2005, he responded to a call from the emergency room of a hospital in Sweetwater; and (3) when he arrived at the emergency room, he took possession of the clothing that K.D. was wearing when she arrived there.

State's witness Les Soles testified that: (1) he was an officer in the Sweetwater Police Department; (2) on the afternoon of May 14, 2005, he responded to a call from the emergency room of a hospital in Sweetwater; (3) when he arrived at the emergency room, his superior there ordered him "to secure the scene at 1403 Hughes"; (4) he went to the residence located at 1403 Hughes Street and made "sure that the scene [was] not contaminated from that point on"; (5) upon his arrival at the residence, he explained to appellant why he was there and "asked [appellant] and his two children to step out onto the front porch," and they complied; (6) he asked appellant for permission to search the residence, and appellant gave his permission; (7) during his search of the residence, he "notice[d] that the bathtub was dry, had no moisture in it with gritty, dried-type sand in the bottom"; (8) the fact that the bathtub was dry seemed significant to him, because appellant had told him "that he had tried to clean the little girl up"; and (9) appellant told him that "he didn't know how [K.D.] had been injured."

State's witness Pat Rollins testified that: (1) she was a registered nurse at the Hendrick Medical Center in Abilene; (2) on May 14, 2005, she examined K.D. at the Medical Center's emergency room; (3) "whenever [she] asked [K.D.] what happened, [K.D.] would just clam right up and get real scared"; (4) K.D. "had a life-threatening" "second-degree laceration" in her vagina; (5) the injury "require[d] surgical intervention" and was "unquestionabl[y]" caused by a sexual assault; and (6) the injury was "not . . . consistent with a fall."

State's witness Michelle Johnson testified that: (1) she was a gynecologist in private practice

in Abilene; (2) on May 14, 2005, she examined K.D. at the Hendrick Medical Center emergency room; (3) at that time, K.D. was "unable or unwilling to give any information" regarding her injury; (4) K.D. had a "second-degree laceration" "to the vaginal area" that "went into the deeper tissues, not just through the skin," and "required surgery to repair"; and (5) K.D.'s injury was consistent with penetration by an adult penis and was probably not caused by a fall.

In addition to calling its witnesses to the stand, the State, as we mentioned previously, offered in evidence numerous exhibits, including K.D.'s medical records from the Rolling Plains Hospital in Sweetwater and the Hendrick Medical Center in Abilene. Those medical records, introduced as State's Exhibit Number Ten, contained, among other things, three sets of notes handwritten by three Hendrick Medical Center employees, in which notes those employees described how K.D., in their presence, had indicated that appellant had caused her injury.[3]

Appellant timely objected to the admission of the handwritten notes on two legal grounds: first, that they contained hearsay within hearsay and were inadmissible under Texas Rule of Evidence 802; and second, that they contained several testimonial hearsay statements, allegedly made by K.D., that were inadmissible under the Sixth Amendment's Confrontation Clause. Appellant cited *Crawford v. Washington*, 541 U.S. 36 (2004), in support of his constitutional argument. The State responded that the notes were admissible under Texas Rule of Evidence 803(4), the medical diagnosis exception to the hearsay rule. The State, perhaps inadvertently, made no effort to establish that the notes were admissible under the Confrontation Clause. The trial court overruled

---

[3] Neither K.D. nor any of the three hospital employees in question testified at appellant's trial.

appellant's objection and admitted the notes after ordering certain parts redacted.[4]  The State read the notes to the jury shortly before resting its case-in-chief.

The first set of notes, dated May 16, 2005, two days after appellant became a suspect, and written by Melissa Foss, a social worker at Hendrick Medical Center, read as follows:

> "Reviewed chart and spoke with charge nurse regarding [unintelligible] of vaginal laceration and alleged sexual assault.  Went to room to talk with patient.  Mom present in room.  Asked mom to talk with patient for a few minutes in private.  Mom went to family room.  Began conversation with patient talking about school and she told me all about her school, teacher, and friends.  I then asked patient about what happened on Saturday before she came to the hospital.  She stated, 'I bleeding and daddy gave me a bath.'  When asked why she was bleeding she stated 'daddy poked me.'  When asked what she was poked with patient stated 'his fingers.' . . .  I then asked patient 'Did daddy poke you with anything else?'  Patient stated 'with his pee-pee.'  I then asked patient 'Has he done this to you before?'  Patient replied 'A lot.'  I asked patient if her dad also did this to her brothers and sisters.  Patient shook her head no and stated 'just me.'  I called out to the nurses station for charge nurse C. Wasson, RN to be a witness. . . .  Casey asked patient 'Can you tell me what happened?'  Patient looked at the floor and stated 'daddy poked me with his pee-pee.'  I asked patient 'What else?' and patient stated 'his fingers.'  I asked patient 'Where was your mom?'  Patient stated 'at the store.' . . .  Casey left room and I told patient I needed to make some phone calls and would check on her later.  Met with mom to discuss conversation with patient.  Asked mom if patient had told her what had happened.  Mom shook her head yes [sic?] and told me how her husband acted very funny when she got home from the grocery store.  Per mom – dad bathed patient (which he never does per mom) and was not concerned with the amount of blood loss.  Told mom to wait until Monday to take [patient] to the doctor.  Mom decided to go ahead and take patient to hospital because 6 yr old daughter told her something bad happened to patient.
>
> "Contacted CPS caseworker Sherry Faulkenberry . . . and detective from Sweetwater Police Department . . . Tonya to discuss.  Informed of conversation with patient.  Spoke to Dr. Johnson and Dr. Shah."[5]

---

[4]  As the court of appeals explained, "The [trial] court allowed the State to introduce [the handwritten notes] containing statements made by K.D. and the questions to which she responded but ordered the State to redact any other third party statements."  *De La Paz v. State*, 229 S.W.3d 795, 798 (Tex.App.–Eastland 2007).

[5]  The record does not reflect why Foss questioned K.D. about the circumstances

The second set of notes, also dated May 16, 2005, and written by Casey Wasson, a nurse at Hendrick Medical Center, read as follows:

> "Called to patient room by M. Foss LSW – Mom outside room. M. Foss LSW asked patient – 'Can you tell Ms. Casey what you just told me?' . . . I asked patient 'Can you tell me what happened?' The patient looked down at a pen she was holding and stated, 'My daddy poked me.' When asked by myself 'With what?' Patient – still looking down – stated, 'With his pee-pee.' M. Foss LSW asked, 'And what else? Was there anything else?' Patient stated, 'His fingers.' . . . I then left the room."

The third set of notes, dated May 15, 2005, and written by C. Rasmussen, a nurse at Hendrick Medical Center, read as follows:

> "Mom called out stating patient wanted to speak to us. L. Calvert, RN and myself in at bedside. Patient up in bed coloring. Patient states 'I saw blood.' I asked, 'Where did you see the blood?' Patient states 'In the toilet.' L. Calvert asks 'Where else?' Patient states 'In the bathtub.' L. Calvert asks 'Did you take a bath before or after you saw the blood?' Patient states 'After.' L. Calvert asks 'Do you know how the blood got there?' Patient states 'No.' And nods her head. . . . At this time Dr. Johnson enters room and patient ceases talking. Other needs voiced."

K.D.'s medical records also included a "Discharge Summary" typewritten by Dr. Paige Lemasters at the Hendrick Medical Center. Appellant did not object to the admission of this discharge summary in evidence. Toward the end of the discharge summary, Lemasters wrote:

> "During the child's hospital stay [at the Hendrick Medical Center], the child disclosed to one of the nurses and social worker, when asked what had happened, the patient said 'daddy poked me with his pee pee.' When asked what else, the patient stated 'his fingers.' There is a thorough documentation of this conversation in the progress notes by the social worker."

As mentioned previously, appellant called four witnesses to the stand at the guilt stage. In addition to calling Angie Medina, whose testimony we have already summarized, appellant called

---

[5](...continued) surrounding her injury or why Foss later contacted Child Protective Services and the Sweetwater Police Department.

Melissa Duran, Irene De La Paz, and himself. Duran testified that: (1) she knew both appellant and Angie Medina; and (2) she had visited their residence at 1403 Hughes Street. Irene De La Paz testified that: (1) she was appellant's aunt; (2) on May 14 and 15, 2005, she visited their residence at 1403 Hughes Street; and (3) several relatives of appellant and Angie Medina were also present at their residence at that time.

Appellant himself testified that: (1) on May 14, 2005, at around 3:00 p.m., Angie Medina left him at home alone with four of their children while she accompanied her mother to a Wal-Mart store; (2) at home with him were their two boys (M.D. and O.D.) and two of their girls (K.D. and C.D.); (3) their third girl, F.D., was staying with a next-door neighbor; (4) after Medina left, he bathed the two girls and, later, the two boys; (5) once the children were bathed, they went outside to play; (6) when Medina returned from Wal-Mart, she put her purchases on a table and then went to the bathroom; (7) he accompanied Medina into the bathroom; (8) while they were in the bathroom together, they heard a knock at the front door; (9) he went to the front door and opened it but found no one there; (10) he and Medina then heard a knock at the back door; (11) he went to the back door, opened it, and found K.D. there, with "blood on her fingers"; (12) he asked K.D. where she was bleeding, and K.D. told him "it was down there"; (13) he took K.D. by the hand and took her to his bedroom, so that he could examine her injury; (14) Medina then entered the room and asked what he and K.D. were doing; (15) he explained the situation to Medina, who also examined K.D.; (16) he and Medina then "started . . . cleaning" K.D. but could not stop her bleeding; (17) Medina stated that she intended to take K.D. to a doctor, and he told Medina to "go ahead"; (18) at around 4:00 p.m., Medina's mother took her and K.D. to a local hospital, while he stayed home with the rest of the children; (19) Medina telephoned him from the hospital and told him that "some cops . . . were

going to go looking through the house"; (20) about an hour after that telephone call, several police officers, including Officer Tonya Sides, arrived at the residence and searched it; (21) Sides then asked him to go to the Sweetwater Police Station and give a statement, and he agreed to do so; (22) one of the officers transported him to the police station in a police vehicle; (23) while at the station, he gave a written statement (State's Exhibit Number One), which was truthful, and then returned home; (24) on May 17, 2005, two officers came to his residence, arrested him, and took him to jail; (25) when he arrived at the jail, he gave a second written statement (State's Exhibit Number Two), in which he falsely admitted causing K.D.'s injury accidentally; and (26) he gave the second statement because Sides had told him that he would certainly be convicted of assaulting K.D., that she (i.e., Sides) knew the district attorney, and that she could "get [him] probation" if he would just admit that he "did it." Appellant testified further that: (27) on the day in question, May 14, 2005, he and Medina were at a low point in their relationship; (28) about a week before that day, he and she "had got into a fight and [had] called the cops"; and (29) during their fight, "[s]he had scratched [him] up and [he] had [had] to hit her a couple of times." Finally, appellant testified that he had a prior conviction for burglary of a building.

After hearing all the evidence at the guilt stage, the jury found appellant guilty of two counts of aggravated sexual assault, as charged in the indictment. The jury also found appellant guilty of one count of injury to a child under Texas Penal Code § 22.04(a)(1).[6]

At the punishment stage, the State called one witness, Leann Hicks, and appellant called one

---

[6] The trial court's charge authorized the jury to convict appellant of injury to a child, although that offense was not alleged in the indictment. The record does not reflect why the trial court's charge did this. The record does reflect, however, that appellant did not object to the trial court's charge.

witness, Angie Medina. Hicks testified that: (1) she was a licensed professional counselor in private practice; (2) most of her practice involved counseling child victims of sexual assault; (3) such child victims, in the course of their lives, may have a range of recurring symptoms stemming from their trauma, including "withdrawal," anger, poor scholastic performance, sexual promiscuity, and drug abuse; (4) she began counseling K.D. on May 24, 2005; (5) K.D.'s symptoms included "extreme withdrawal," both physical and verbal, anger, and emotional upset; (6) K.D. suffered from post-traumatic stress disorder because of appellant's assault on her; and (7) the assault "severed the safety mechanism that parents usually provide" for their children.

Angie Medina testified that: (1) she did not know how K.D. would respond if she (i.e., K.D.) encountered appellant later in life; and (2) she (i.e., Medina) had no opinion concerning the appropriate punishment for appellant's offense.

After hearing all the evidence at the punishment stage, the jury assessed appellant's punishment at imprisonment for 75 years and a fine of $10,000 for each count of aggravated sexual assault, and imprisonment for 20 years and a fine of $10,000 for the count of injury to a child. The trial court ordered that appellant's sentences would all run concurrently.

On direct appeal, appellant, again citing *Crawford v. Washington*, 541 U.S. 36, argued that his "rights under the [Sixth Amendment] Confrontation Clause were violated by the introduction [and admission in evidence] of entries in [K.D.'s] medical records by M. Foss . . . and the Hendrick [Medical Center] nurses, without having Foss, Wasson, [Rasmussen,] or [K.D.] testify." Appellant argued further, as he had in the trial court, that K.D.'s alleged hearsay statements implicating him in the offense, as related in the handwritten notes, were "objectionable testimonial hearsay." With respect to the harmfulness of the tainted evidence to his defense, appellant argued that, "[g]iven the

conflicting testimony and evidence, it is hard to say beyond a reasonable doubt that the error of admitting [the notes] is harmless." Appellant also pointed out that "the objected-to [notes were] the only evidence that [he] penetrated [K.D.] on multiple occasions."

In its reply brief, the State argued that K.D.'s hearsay statements "were non-testimonial because the statements were made to medical personnel, not law enforcement." The State also pointed out that "law enforcement was not present" at the time of the alleged statements, "nor did they request the interview." The State argued further that, in any case, "[i]t would be speculative to suppose that [K.D.] made the statements with any intention that they affect Appellant's criminal prosecution." Finally, the State argued that, even if the trial court erred in admitting the objected-to handwritten notes, "the error was harmless beyond a reasonable doubt [because] the evidence against Appellant was so strong that [K.D's hearsay] statements could not have contributed to his conviction."

The Eleventh Court of Appeals rejected appellant's arguments and affirmed the judgment of the trial court. *De La Paz v. State*, 229 S.W.3d 795, 798-99 (Tex.App.–Eastland 2007). The court of appeals explained its holding as follows:

> "In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court held that the admission of testimonial hearsay violated the Sixth Amendment right to confrontation unless the declarant was shown to be unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. The Supreme Court did not provide an exclusive definition of testimonial statements but did hold that the confrontation clause applies to witnesses who 'bear testimony,' which, it noted, is 'typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'
> "Foss's and Wasson's notes arguably raise two potential confrontation clause questions: Did K.D. really say what they wrote and, if so, are her accusations accurate? When the notes are stripped of any personal observation or third party comment, they remain evidence that K.D. implicated her dad to hospital staff but not evidence that K.D.'s accusations were true. The jury was tasked with determining

whether K.D.'s accusations were accurate – not if the recorded conversations took place. K.D.'s accusations were certainly relevant to the jury's determination. However, their bare repetition does not fall within the Supreme Court's definition of testimonial statement; therefore, Delapaz's inability to cross-examine Foss and Wasson did not violate his right of confrontation." *De La Paz v. State*, 229 S.W.3d at 798-99.

Appellant later filed a petition for discretionary review, which we granted. *See* Tex. R. App. Proc. 66.3(b). In their briefs to this Court, both appellant and the State reiterate the arguments that they made in the court of appeals. The State also argues that the court of appeals's analysis is sound.[7]

The Confrontation Clause of the Sixth Amendment to the Constitution of the United States provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." This bedrock procedural guarantee applies to both federal and state prosecutions. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

Consistent with the Confrontation Clause guarantee, a testimonial hearsay statement may be admitted in evidence against a defendant "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington*, 541 U.S. at 59. "[T]he *Crawford* rule reflects the Framers' preferred mechanism (cross-examination) for ensuring that inaccurate out-of-court testimonial statements are not used to convict an accused."

---

[7] The State argues further that "appellant forfeited his right to confront the victim in this case through [his] wrongdoing." *See Gonzales v. State*, 195 S.W.3d 114 (Tex.Crim.App. 2006) (discussing the doctrine of forfeiture). We decline to consider this argument, however, because the State failed to make it in the court of appeals. As Professors Dix and Dawson have pointed out, under our case law, "[t]he party prevailing in the court of appeals cannot, on discretionary review, rely upon grounds in support of the judgment that were not presented to the court of appeals." G. Dix & R. Dawson, *Texas Practice: Criminal Practice and Procedure* § 44.24 at 864 (2nd ed. 2001). *See Smith v. State*, 70 S.W.3d 848, 850 (Tex.Crim.App. 2002); *Davis v. State*, 870 S.W.2d 43, 47 n. 7 (Tex.Crim.App. 1994); *Polk v. State*, 729 S.W.2d 749, 755 (Tex.Crim.App. 1987); *Prince v. State*, 754 S.W.2d 155, 158-59 (Tex.Crim.App. 1984).

*Whorton v. Bockting*, ___U.S.___, ___, 127 S.Ct. 1173, 1182 (2007) (parenthetical material in original).

The primary focus in determining whether a hearsay statement is "testimonial" is upon the objective purpose of the interview or interrogation, not upon the declarant's expectations. *Davis v. Washington*, 547 U.S. 813, 822-23 (2006); *Rangel v. State*, No. PD-0447-06, ___S.W.3d___, ___ (Tex.Crim.App.–Feb. 13, 2008) (Cochran, J., dissenting). Generally speaking, a hearsay statement is "testimonial" when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Davis v. Washington*, 547 U.S. at 822-23. In such a situation, the person offering information is literally bearing testimony.

Whether a statement may be testimonial if made, as in this case, to a non-government employee has not yet been resolved by the Supreme Court. K. Broun (ed.), *McCormick on Evidence* § 252 at 165 (6th ed. 2006). Whether a statement is testimonial is a question of law. *Wall v. State*, 184 S.W.3d 730, 742 (Tex.Crim.App. 2006).

Once appellant objected to the admission of the notes under *Crawford*, the burden shifted to the State, as the proponent of that evidence, to establish that it was admissible under *Crawford*. *Vinson v. State*, Nos. PD-1540-06 & 1541-06, ___S.W.3d___, ___ (Tex.Crim.App.–Jan. 16, 2008).[8]

---

[8] In *Vinson* we noted:

> "In our criminal justice system, the proponent of evidence ordinarily has the burden of establishing the admissibility of the proffered evidence. If no objection is made, the evidence is generally deemed admissible. However, once an objection is made, the proponent must demonstrate that the proffered evidence overcomes the stated objection." *Vinson v. State*, Nos. PD-1540-06 & 1541-06, ___S.W.3d___, ___ (Tex.Crim.App.–Jan. 16, 2008).

(continued...)

In other words, once appellant objected, the State was obligated to establish either (1) that the notes did not contain testimonial hearsay statements or (2) that the notes did contain testimonial hearsay statements but that such statements were nevertheless admissible under *Crawford*.

After reviewing the record, we conclude that the State failed to carry its burden. Certainly, the hearsay statements contained in the notes were not obviously non-testimonial. Moreover, the State never established why the social worker, Foss, interviewed K.D. in the hospital two days after appellant became a suspect, or why, immediately after that interview, Foss contacted Child Protective Services and the Sweetwater police. The answers to those questions would have helped establish whether K.D.'s statements were testimonial. Because the State failed to carry its burden,[9] the trial court erred in admitting the notes, and the court of appeals erred in holding otherwise.

We reverse the judgment of the court of appeals and remand the case to that court for a harm analysis.

DELIVERED JUNE 18, 2008

PUBLISH

---

[8](...continued)

*See Cofield v. State*, 891 S.W.2d 952, 954 (Tex.Crim.App. 1994) (once defendant objected to evidence on the basis of the hearsay rule, the State was obligated to show that the evidence was admissible under an exception to the hearsay rule); *Long v. State*, 800 S.W.2d 545, 548 (Tex.Crim.App. 1990) (placing the burden on the prosecutor "as the proponent of the evidence . . . to satisfy each element of his predicate for admission of the mother's testimony pursuant to Art. 38.072").

[9] We hasten to add that we are not holding that the notes in question contained testimonial hearsay statements. Rather, we are holding only that the State failed to establish that the notes were admissible under *Crawford*.