

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-23-00081-CR
_____

KENDALL DAMAAL JOHNSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th District Court
Gregg County, Texas
Trial Court No. 52881-B

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

# MEMORANDUM OPINION

Kendall Damaal Johnson appeals his conviction for murder. Johnson was convicted as a party for the killing of his former girlfriend, Lakeisha Kenney. On appeal, Johnson complains that (1) the testimony of accomplice witness, Calvin Anderson, was not sufficiently corroborated, (2) the trial court erred by not instructing the jury on the requirement of corroboration of Anderson's testimony, (3) the evidence was legally insufficient to support the jury's verdict, (4) the trial court erred by allowing a police officer to testify to testimonial statements over Johnson's objection, and (5) the trial court erred by including jury instructions on party and conspiracy liability. Upon review of the record and applicable law, we find these arguments present no reversible error. We affirm the trial court's judgment.

## I. Background and Evidence

Johnson and Kenney were in a romantic relationship that ended in May or June 2021. Johnson wanted to reconcile. Kenney was not receptive. Johnson recruited a mutual friend to contact Kenney on his behalf, with Johnson telling the friend what to write to Kenney. Johnson asked another mutual friend, his pastor, to contact Kenney with a long message drafted by Johnson, but that friend refused. In August 2021, Johnson recruited an old college friend, Calvin Anderson, to help Johnson stalk Kenney. On the night of September 2, 2021, Johnson and Anderson drove to the restaurant where Kenney worked, followed her, and then drove to her Kilgore home before she arrived. Johnson let Anderson out of the car, and Anderson came up behind Kenney and fatally stabbed her seventeen times.

Kilgore Detective Stephen Goodson testified that, in the hours after Kenney's murder, Kenney's family quickly named Johnson as a suspect. In the early morning hours of September 3, police located Johnson at his home in Tyler. During at least two interviews, Johnson gave multiple stories about his involvement in Kenney's murder. Johnson told Goodson that Anderson had stabbed Kenney; however, at that point in the interview, Goodson had not told Johnson how Kenney was killed. Johnson told Goodson that, on the night of the killing, Anderson asked him to drive by Kenney's house, then asked Johnson to let him out. Johnson claimed that, when Anderson got back in the car, he told Johnson to drive and that he had stabbed Kenney in the chest.

Before Johnson's trial, Anderson pled guilty to killing Kenney. Anderson gave multiple versions of events to investigators, but at trial, he testified that, per Johnson's instructions, he purchased dark clothes, including a mask, and a knife the day of the murder. Before leaving work at 9:30 that night, he changed into those clothes. Surveillance footage from the store where Anderson worked confirmed those purchases and Anderson's change of clothes. Although he owned a Tahoe SUV, that night Johnson picked Anderson up in a red Chrysler 300, which Johnson had borrowed, and they drove to Kilgore. Surveillance footage from the restaurant where Kenney worked showed the Chrysler 300 in the restaurant's parking lot and, later, Kenney getting into her car and leaving, with the Chrysler 300 following, a little after 10:00 p.m. The 9-1-1 call reporting Kenney's death was made at 10:28 p.m. University of Texas at Tyler surveillance footage showed the Chrysler 300 pull onto the campus at 11:14 p.m., with Johnson's Tahoe following. A man driving the Tahoe exited that vehicle, and a man driving the Chrysler

3

300 exited that car and got into the Tahoe's driver's seat. The man who had been driving the Tahoe to UT Tyler got in the Tahoe's passenger seat. The Tahoe then stopped at 11:22 p.m. at a local gas station near the campus. In Johnson's Tahoe, police found a receipt from the gas station dated September 2, 2021, at 11:24 p.m.

Johnson told Goodson that he had no idea Anderson was going to stab Kenney. In his initial story to Goodson, Johnson said he and Anderson went to Kilgore in his Tahoe. Later in the same interview, though, he admitted that he borrowed and drove the Chrysler 300.

## II.    Accomplice Witness and Corroboration

Johnson's first and fifth points of error have to do with the requirement that testimony of an accomplice witness be corroborated by evidence tending to connect the defendant with the offense committed. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14. Johnson argues in his first point of error that the non-accomplice evidence did not sufficiently corroborate Anderson's testimony. He claims in his fifth point of error that the trial court erred in not including the instruction in the jury's charge and that the error caused Johnson egregious harm.

"A prosecution witness who is indicted for the same offense with which the defendant is charged is an accomplice as a matter of law." *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002). "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14. This "rule has been a part of Texas law since at least 1925, and reflects 'a legislative determination that accomplice testimony implicating another person should

4

be viewed with a measure of caution, because accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person.'" *Zamora v. State*, 411 S.W.3d 504, 509–10 (Tex. Crim. App. 2013) (quoting *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)).

Because Anderson was Johnson's co-defendant and pled guilty to the murder, Anderson was an accomplice as a matter of law.

### A.    Standard of Review for Corroboration of Accomplice-Witness Testimony

"When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we 'eliminate the accomplice [witness's] testimony from consideration and then examine the remaining portions of the record to [determine] if there is [other] evidence that tends to connect the accused with the commission of the crime.'" *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)); *see Hall v. State*, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd). "To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Malone*, 253 S.W.3d at 257. "Rather, the evidence must simply link the accused in some way to the commission of the crime and show that 'rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.'" *Id.* (alteration in original) (quoting *Hernandez v. State*, 939 S.W.2d 173, 179 (Tex. Crim. App. 1997)). "Proof that the accused was at or near the scene of the crime . . . with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App.

5

1984).  "[A]n accused's opportunity to commit the offense may be a suspicious circumstance."

*Gill v. State*, 873 S.W.2d 45, 49 (Tex. Crim. App. 1994).

The Texas Court of Criminal Appeals has described this review as follows:

> No precise rule can be formulated as to the amount of evidence required to corroborate.  The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt.  Nor must the non-accomplice evidence directly link the accused to the commission of the offense.  While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense.  Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

*Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) (citations omitted).

"[A]pparently insignificant circumstances sometimes afford most satisfactory [evidence of guilt and] corroboration of an accomplice's testimony."  *Paulus v. State*, 633 S.W.2d 827, 832 (Tex. Crim. App. [Panel Op.] 1981) (quoting *Holmes v. State*, 157 S.W. 487, 493 (Tex. 1913)).  We review the corroborating evidence "in the light most favorable to the jury's verdict."  *Gill*, 873 S.W.2d at 48.

### B.    Accomplice-Witness Testimony

At the time of Johnson's trial,[1] the trial court had not sentenced Anderson, Anderson and the State had not articulated an agreed sentencing recommendation, and the trial court had not set a date for Anderson's sentencing hearing.

---

[1] Johnson's trial was held in March 2023.  One of the State's questions to Anderson suggested he pled guilty in or before January 2023.

Anderson and Johnson were Freemasonry fraternity brothers at Texas College in Tyler in 2009. After college, Anderson and Johnson stayed in contact "[s]poradically," according to Anderson. On or about August 20, 2021, Johnson called Anderson, and the two began regular communication, including exchanging text messages. Anderson testified that Johnson would frequently complain about Kenney and his unsuccessful attempts to reconcile with her. Anderson, who did not know Kenney, testified that Johnson "wanted to, like, pretty much stalk her out and see what's going on. . . . [C]heck on her where she's going and who she's with and stuff like that." Johnson wanted Anderson to assist in those stalking activities. He asked Anderson to monitor Kenney's Facebook posts "and see what she's doing or who she's communicating with on Facebook, and also, like, go to her job or her home." At least one time before the night of the murder, with Johnson driving, the pair drove by Kenney's home and the restaurant where she was employed. Johnson wanted Anderson to "vandalize" Kenney's home by "smash[ing] the windows of her front house door."

When asked how Johnson asked him to participate in those acts, Anderson testified, "By just pretty much saying it." Anderson characterized Johnson's communications as "hostile" and "manipulative." He claimed that Johnson was "being forceful about the whole situation." Johnson offered Anderson "money, cars, [and] investments in" Anderson's fashion design business, although there is no evidence any remunerative transaction ever occurred.

Eventually, Johnson's plans for Kenney exceeded stalking and vandalism. Anderson testified that Johnson told him, "[S]he's got to be gone before winter . . . . We're going to do this. I'm going to have it set up. And when I pick you up, we're going to go do it." Anderson said,

"Through text message or phone call [Johnson] sa[id] that . . . he's ready to pretty much hurt her; that . . . he wants her not to be alive anymore."

On the night of September 2, 2021, Johnson picked up Anderson from his job at a department store. Anderson had complied with Johnson's instructions and purchased, at the store where he worked, dark clothes, a mask, gloves, shoes, and a knife. Johnson arrived to pick up Anderson, not in Johnson's Tahoe, but in a red Chrysler 300 that he had borrowed. The pair waited outside the restaurant where Kenney worked, and when she left, they followed her. Anderson testified that Johnson "trie[d] to run [Kenney] off the road a couple of times." They drove to Kenney's house, and her car was not in the driveway. Johnson drove around the neighborhood, then pulled back in front of Kenney's house. He dropped Anderson off and told him "to wait." Johnson then waited down the street. Kenney arrived and got out of her car. Anderson came up behind Kenney and stabbed her seventeen times.

The evidence includes text messages between Anderson and Johnson. On August 28, 2021, Johnson wrote to Anderson that Kenney "went out" and that Johnson "was going to get [Anderson] to smash the windows of her front house door." Anderson's response indicated that he did not have access to a car. In the same text conversation, Johnson offered to pay Anderson $100.00 to "smash her front house door because she stepped out," if Anderson could find transportation. Johnson identified the phone number from which he was contacting Anderson, saying, "We going to use this number it's no trace from my other number," and, "This a burner."

As noted above, Anderson admitted that he murdered Kenney.

8

## C. Non-Accomplice-Witness Evidence

Johnson admitted being with Anderson the night of Kenney's murder. Although insufficient in and of itself, we examine the record for other "suspicious circumstances" that may tend to connect Johnson with Kenney's murder and corroborate Anderson's testimony. *See id.* at 49.

As a former romantic partner of Kenney, Johnson was a suspect within hours of her killing and was interviewed shortly thereafter. Although Detective Goodson had not told Johnson how Kenney was killed, Johnson told Goodson not only that she had been stabbed[2] but that Anderson was the killer. Goodson testified that he initially did not believe Anderson was a real person. Johnson's knowledge of the method of Kenney's murder, without disclosure by law enforcement, is a suspicious circumstance tending to connect Johnson to the murder.

Not only did Johnson admit being with Anderson the night of the murder, he also told investigators that he did not drive his personal Tahoe truck but drove a red Chrysler 300 that he borrowed from a friend. He told Goodson that he borrowed the Chrysler 300 to drive from Tyler to Kilgore because his Tahoe needed an oil change and a front-end alignment. However, when investigators found the Chrysler 300 and its owner, a woman named Janee Clewis, she told officers that Johnson said he needed to borrow her car to follow his brother's fiancé, who would recognize his Tahoe. Johnson told Clewis that he suspected the fiancé of cheating on his brother.

---

[2]Knowledge of details of a crime that had not been made public "are inculpatory admissions." *Dossett v. State*, 216 S.W.3d 7, 26 (Tex. App.—San Antonio 2006, pet. ref'd). Dossett told investigators he had a dream in which he saw distinct images of the crime scene which had "not [been] mentioned in the press releases and news articles." *Id.*

9

When officers found the Chrysler 300 the morning after Kenney's murder, her blood was found on the passenger-side door handle. Although no blood was found in Johnson's Tahoe and Anderson said he sat in the passenger side of the Chrysler 300, the fact that Kenney's blood was found on the car that Johnson borrowed and gave conflicting stories about the circumstances of borrowing is a suspicious circumstance connecting Johnson to Kenney's murder.

Other circumstances that, in the aggregate, are suspicious when combined with Johnson being with Anderson the night of the murder include (1) law enforcement found Johnson at Johnson's home around 4:00 a.m., about six hours after the murder, (2) when officers drove by the house thirty minutes prior, Johnson's Tahoe was not there, and (3) the Tahoe was in the driveway when officers returned. Goodson testified that, when he approached the front door of the house, he heard "the doorknob start to move," then Johnson came out the front door. Johnson did not seem surprised by the presence of Goodson and several officers.[3] Also, Goodson observed that the Tahoe "appeared to [have] be[en] wiped down."

Although Kenney had ended her romantic relationship with Johnson, they continued to communicate for at least three months after the relationship ended. Johnson gave Kenney expensive gifts[4] and tried to reconcile with her.[5] He enlisted one common friend, Patrick

---

[3]Goodson was with two other Kilgore police officers and Tyler police officers, as Johnson lived in Tyler.

[4]"[W]hile evidence that addresses only motive or opportunity to commit the crime is, by itself, insufficient to corroborate the accomplice-witness testimony, motive or opportunity evidence may be considered in conjunction with other evidence tending to connect the accused to the crime." *Hatley v. State*, 206 S.W.3d 710, 715 (Tex. App.—Texarkana 2006, no pet.) (citing *Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1988)).

[5]Kenney's sister testified that, while Kenney wanted to remain friends with Johnson, she also did not want to continue dating him. Kenney told her sister not to reply if Johnson contacted her looking for Kenney. Kenney's sister also described a time when Johnson knocked on Kenney's door but Kenney retreated to her room and did not answer.

10

Chatman, to write Kenney messages on Johnson's behalf, with the content suggested by Johnson. Chatman testified that, even though he sent messages on Johnson's behalf, doing so left him feeling "very manipulated," as though he was "doing something that [he] shouldn't be doing." Chatman claimed that he sent the messages because he wanted "to be a good friend." Chatman testified to one occasion where Johnson acquired Chatman's phone and sent a message to Kenney as Chatman. At some point, Chatman said Kenney was "fed up" with Johnson's behavior and was "tired of him."

Johnson tried the same tactic with another friend. Marshall Johnson[6] testified that he had been Johnson's friend since 2013. Marshall was a pastor, and Johnson was a member of his church. On August 18, 2021, Johnson sent Marshall a lengthy text that Johnson had drafted for Marshall to send to Kenney, as if Marshall wrote it.[7] Marshall declined to copy and send the note.

As described above, several pieces of surveillance footage were presented that corroborated Anderson's testimony: (1) footage from the store where Anderson worked, showing him purchasing the dark clothing items he described and a knife and showing him wearing one set of clothes during his September 2 shift, then the dark clothes as he left work that night, and (2) footage from the parking lot of Kenney's employment showing the Chrysler 300 in the parking lot at 9:44 p.m. The surveillance recording showed Kenney getting in her car at 10:03, then leaving her work parking lot at 10:05 p.m., and the Chrysler 300 leaving after her.

---

[6]Marshall was not related to Appellant Johnson.

[7]Marshall read the text before the jury. The message takes three pages of the reporter's record. It details Johnson's pain after the break-up and claims that Johnson had a dream where he was in church and Kenney came to sit next to him.

11

The recording from the UT Tyler campus showed the Chrysler 300 pulling onto campus at 11:14 p.m., followed by Johnson's Tahoe. The driver of the Chrysler 300 got into the Tahoe's driver's seat, the man who drove the Tahoe to the campus moved to the Tahoe's passenger side, and the Tahoe left the campus at 11:20 p.m.

Surveillance footage from a gas station less than a mile from the campus showed the Tahoe pull in at 11:22 p.m. A receipt for that gas purchase was found in Johnson's Tahoe. The receipt was made at 11:24 p.m.

In the aggregate, these circumstances, combined with Johnson's admission that he was with Anderson the night of the murder, are sufficient evidence tending to connect Johnson with Kenney's murder, and they sufficiently corroborate Anderson's testimony. We overrule Johnson's first point of error.

## III. No Egregious Harm in Absence of Accomplice-Witness Jury Instruction

### A. Review for Jury-Charge Error[8]

Attendant to his argument that there was insufficient evidence to corroborate the accomplice-witness testimony, Johnson claims that he was egregiously harmed by the trial court's failure to instruct the jury on the corroboration requirement. Although we agree that the

---

[8]"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13. "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id.* (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

trial court erred not to include the corroboration requirement in its charge to the jury, we hold that Johnson was not egregiously harmed by that error.

"When the evidence clearly shows a witness is an accomplice witness as a matter of law, the trial court must so instruct the jury." *Solis v. State*, 792 S.W.2d 95, 97 (Tex. Crim. App. 1990) (citing *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987)). *Zamora* states,

> Because the [accomplice-witness] rule requires corroboration of accomplice-witness testimony before a conviction can stand, the jury must be instructed accordingly, but the particular instruction that must be given depends on the circumstances of each case. We examine the various types of accomplice-witness instructions to explain why all of these types should be similarly treated under *Almanza*.[9]

*Zamora*, 411 S.W.3d at 510.

"We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.)).

"The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error." *Id.* at 555 (citing *Abdnor*, 871 S.W.2d at 732). When, as here, the defendant "did not object to the charge, we will not reverse [the judgment] unless the record shows the error resulted in egregious harm." *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005)). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or

---

[9]*See Almanza v State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984) (op. on reh'g).

vitally affects a defensive theory." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)). Finally, "the record must show that a defendant has suffered actual, rather than merely theoretical, harm from jury instruction error." *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005) (citing *Dickey v. State*, 22 S.W.3d 490, 492 (Tex. Crim. App. 1999)).

## B. Analysis

"Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)). In *Casanova v. State*, the court stated,

> [T]he reviewing court must take the entire record into account, as in any *Almanza* analysis,[10] to assess whether the jury, had it been properly instructed on the law requiring corroboration of accomplice-witness testimony, "would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive."

*Casanova v. State*, 383 S.W.3d 530, 534 (Tex. Crim. App. 2012) (footnote omitted) (quoting *Saunders*, 817 S.W.2d at 692) (citing *Herron*, 86 S.W.3d at 632).

> Once it is determined that such non-accomplice evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the factfinder's decision-making. Therefore, non-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve.

*Herron*, 86 S.W.3d at 632. "Whether error in failing to submit an accomplice-witness instruction will be deemed harmful is . . . a function of the strength of the corroborating evidence."

---

[10]*See Almanza*, 686 S.W.2d at 171 (op. on reh'g).

*Casanova*, 383 S.W.3d at 539. "The strength of that evidence is, in turn, a function of (1) its reliability or believability and (2) how compellingly it tends to connect the accused to the charged offense." *Id.*[11]

The non-accomplice evidence "tending to connect [Johnson] to [Kenney's murder] was far from insubstantial." *Id.* at 540. Johnson knew Kenney had been stabbed to death before law enforcement told him how she died. He admitted driving a borrowed car the night of the killing, and surveillance footage showed that car in the parking lot of Kenney's employer and then following her out of the lot. Surveillance footage also showed that car being dropped off at the UT Tyler campus and the Chrysler 300's driver then assuming the driver's seat in Johnson's Tahoe. The Tahoe was seen two minutes later at a gas station across the street from the campus, and a receipt for a gas purchase made two minutes later was found in Johnson's Tahoe. Kenney's blood was found on the door handle of that borrowed car. Add to the inconsistent stories Johnson gave law enforcement the fact that he was not home until about 4:00 a.m. after Kenney was murdered and the fact that he did not seem surprised to see law enforcement at his home at that early hour, those circumstances tend to connect Johnson to Kenney's murder to an extent that the purpose of the absent instruction was "fulfilled." *Herron*, 86 S.W.3d at 632 ("Once it is determined that such non-accomplice evidence exists, the purpose of the instruction

---

[11]In *Casanova*, the Texas Court of Criminal Appeals applied an "egregious harm analysis under *Almanza/Saunders/Herron*." *Casanova*, 383 S.W.3d at 538. Under this review, the court did not include arguments of the parties, the rest of the jury charge, "and any other relevant information." *See Almanza*, 686 S.W.2d at 171. The court reviewed the evidence corroborating the accomplice witness to decide if, "though legally sufficient," such evidence "may yet prove in a given case to be so insubstantial or 'unconvincing' as to render the lack of an accomplice-witness corroboration instruction egregiously harmful." *Casanova*, 383 S.W.3d at 539 (quoting *Saunders*, 817 S.W.2d at 692). The court, though, did not analyze the state of the evidence, charge, and argument, as in other *Almanza* cases.

is fulfilled . . . . [N]on-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve.").

Johnson was not egregiously harmed by the trial court's failure to instruct the jury on the requirement of corroboration of the accomplice-witness's testimony. We overrule this point of error.

## IV. The Evidence Was Sufficient to Support the Verdict

Johnson next complains that the evidence was insufficient to support the jury's verdict of guilt. We now analyze all of the evidence presented to the jury.

### A. Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)). Included in our review of all the evidence is the accomplice-witness testimony. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997)

The jury, as "the sole judge of the credibility of the witnesses and the weight to be given their testimony[, could] 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Williamson*, 589 S.W.3d at 297 (second alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

17

**B.        Analysis**

We incorporate the evidence discussed in our analysis finding Anderson's accomplice-witness testimony sufficient to tend to connect Johnson to Kenney's murder.  We also point out one other significant piece of evidence that we did not include in our accomplice-witness review.  In one of the text message exchanges between Anderson and Johnson, Johnson began using a new phone number.  He told Anderson, via text message, he was using the new phone number from a "burner phone."  Printouts of text messages between Anderson and Johnson show that Johnson was communicating with the burner phone on August 28, 2021, five days before Kenney was murdered.

More records were produced that established that, on August 29, Kenney began exchanging text messages with a man she knew as Troy, whose phone number was the same as Johnson's burner phone.  Over the next few days, leading up to the morning of Kenney's murder, Troy asked Kenney several questions about her ex-boyfriend, urging her to reconcile with him, and kept asking for Kenney's address so he could come see her.  Kenney in turn asked Troy why he was so concerned with her ex-boyfriend and refused to divulge personal information to Troy. She wrote, "I don't know you like that.  I don't need you knowing where I live [be]cause I don't know you like that.  You very well could be a serial killer or sex trafficker.  Nah. . . . I kinda like my life.  Laugh out loud."

Considered in toto and in the light most favorable to the jury's verdict, a rational jury could have found that Johnson acted with "intent to promote or assist" in the killing of Kenney

by "solicit[ing], encourag[ing], direct[ing], aid[ing], or attempt[ing] to aid" Anderson's murder of Kenney. TEX. PENAL CODE ANN. § 7.02(a) (Supp.). We overrule this point of error.

## V.  Out-of-Court Statements Were Not Testimonial

Over Johnson's objection, Lieutenant Joey Chitwood testified about his investigation of the red Chrysler 300 driven by Johnson the night of the murder. Johnson complains that Chitwood was allowed to testify to statements made by Clewis, the owner of the Chrysler 300, in violation of the Confrontation Clause[12] and *Crawford v. Washington*. We conclude that Clewis's statements were not testimonial and that there was no error in allowing Chitwood's testimony.

### A.  Review for Testimonial Statements

The United States Constitution's Confrontation Clause "restricts the introduction of out-of-court statements . . . in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). Such statements are testimonial in that the testimony they present is characterized as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (alteration in original) (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). Testimonial statements are precluded from admission at trial, under the authority of the Sixth Amendment, unless the declarant is unavailable and the opponent of the statement has had a prior opportunity to cross-examine the declarant. *See id.* at 68 ("Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.").

---

[12]*See* U.S. CONST. amend. VI.

While "[t]he United States Supreme Court has yet to define the outer boundaries of what constitutes a 'testimonial' out-of-court statement, . . . it has identified 'three kinds of [out-of-court] statements that could be regarded as testimonial:'

- ex parte in-court testimony or its functional equivalent—that is, materials such as affidavits, custodial examinations, prior testimony that the accused was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;

- extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and

- statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010) (second alteration in original) (footnotes omitted) (citations omitted). "Whether a statement is testimonial is a question of law." *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008)

When determining whether a statement is testimonial, "we look to determine whether 'the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" *Langham*, 305 S.W.3d at 576 (quoting *De La Paz*, 273 S.W.3d at 680). Even an out-of-court statement that falls within the United State Supreme Court's definition of testimonial statements "is not objectionable under the Confrontation Clause to the extent that it is offered for some evidentiary purpose other than the truth of the matter asserted." *Id.* (citing *Crawford*, 541 U.S. at 59 n.9).

### B.    Analysis

"When the relevance of an out-of-court statement derives solely from the fact that it was made, and not from the content of the assertion it contains, there is no constitutional imperative that the accused be permitted to confront the declarant." *Langham*, 305 S.W.3d at 576.

In *Del Carmen Hernandez v. State*, the Texas Court of Criminal Appeals found that a co-defendant/declarant's statement to an investigator was admissible to impeach the co-defendant/declarant's credibility. *Del Carmen Hernandez v. State*, 273 S.W.3d 685, 689 (Tex. Crim. App. 2008). The co-defendant/declarant, Leffew, bragged to fellow jail inmates that she had drugged and killed the victim. *Id.* at 686–87. However, Leffew told the detective on the case that, while she drugged the victim, Del Carmen Hernandez killed him. *Id.* at 686.

As in *Del Carmen Hernandez*, Clewis's statement to investigators was admissible to impeach Johnson's inconsistent statement to investigators about why he borrowed the Chrysler 300 the night of the murder, i.e., because his Tahoe needed maintenance work. The trial court did not err in admitting Chitwood's testimony about Clewis's statement. We overrule the point of error.

## VI.    The Court's Instruction on Party Liability Was Appropriate

Lastly, we address Johnson's complaint that the trial court erred to instruct the jury on law of party liability and conspiracy.[13] Where an appellant claims error in the trial court's charge, we first determine whether there was charge error. *Posey v. State*, 966 S.W.2d 57, 61

---

[13] "[I]f the evidence supports a charge on the law of parties, the court may charge on the law of parties even though there is no such allegation in the indictment or information." *Tate v. State*, 811 S.W.2d 607, 607 n.3 (Tex. Crim. App. 1991) (quoting *Tate v. State*, 793 S.W.2d 760, 763 (Tex. App.—Fort Worth 1990, pet. granted), *rev'd by* 811 S.W.2d 607). Neither the indictment nor the amended indictment alleged that Johnson was guilty as a party.

21

(Tex. Crim. App. 1998) (citing *Almanza*, 686 S.W.2d at 174).  Because the evidence warranted these instructions, the court did not err.

The trial court's charge instructed the jury as follows:

> A person is criminally responsible as a *"Party"* to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.  Each party to an offense may be charged with commission of the offense.

> A person is *"Criminally Responsible"* for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.  Mere presence alone will not constitute one a party to a crime.

> . . . .

> By the term *"Conspiracy"* is meant an agreement between two or more persons, with intent that a felony be committed, that they, or one or more of them, engage in conduct that would constitute the offense.  An agreement constituting a conspiracy may be inferred from the acts of the parties.

This language effectively tracks the applicable portion of the Texas Penal Code:

> (a)     A person is criminally responsible for an offense committed by the conduct of another if:

>> (1)     acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;

>> (2)     acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; . . . .

TEX. PENAL CODE ANN. § 7.02 (Supp.).  It is the responsibility of the trial court to instruct the jury on the "law applicable to the case."  TEX. CODE CRIM. PROC. ANN. art. 36.14.

22

"[U]nder the law of parties, the State is able to enlarge a defendant's criminal responsibility to acts in which he may not be the principal actor." *Goff v. State*, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996). "[T]he State is required to properly instruct the jury if it proceeds upon a parties theory." *Id.*

The evidence here showed that Anderson stabbed and killed Kenney after Johnson recruited, directed, and encouraged him to prepare for and then complete that murder. If Johnson were to be found guilty, it had to be as a party. Therefore, the trial court's instruction was not only appropriate, it was required.

There was no charge error. We overrule the point of error.

## VII.   Conclusion

Having overruled all of Johnson's points of error, we affirm the trial court's judgment.


Charles van Cleef
Justice


Date Submitted:     November 28, 2023
Date Decided:       January 31, 2024

Do Not Publish

23